1 | AMIAD KUSHNER (*Pro Hac Vice* Application pending)
akushner@seidenlegal.com
2 | SEIDEN LAW GROUP LLP
469 Seventh Avenue, 5th Fl.
3 | New York, New York 10018
Telephone:    (646) 766-1914
4 | Facsimile:    (646) 304-5277

5 | BENJAMIN TAYLOR (State Bar No. 240636)
btaylor@taylorlawfirmpc.com
6 | THE LAW OFFICES OF BENJAMIN TAYLOR
A Professional Corporation
7 | 1880 Century Park East, Suite 714
Los Angeles, California 90067
8 | Telephone:    (310) 201-7600
Facsimile:    (310) 201-7601

9 |
Attorneys for Plaintiff/Creditor
10 | HONG LIU

11 | **UNITED STATES BANKRUPTCY COURT**

12 | **CENTRAL DISTRICT OF CALIFORNIA**

13 |

14 | **In re:**                              | Chapter 11

15 |     **YUETING JIA,**                     | Adversary Case No.:

16 |           **Debtor.**                    | Bankruptcy Case No: 2:19-bk-24804-VZ

17 | _____

18 |                                          | **COMPLAINT TO DETERMINE NON-**
**DISCHARGEABILITY OF DEBT**
19 | **HONG LIU, an individual,**             | **PURSUANT TO 11 U.S.C. §523(a)(2)(A)**
**AND 11 U.S.C. § 523(a)(2)(B)**
           **Plaintiff,**
20 | v.

21 | **YUETING JIA, an individual; and DOES 1**
**through 20, inclusive,**
22 |
           **Defendant/Debtor.**
23 |

24 | _____

25 |

26 |

27 |

28 |

## COMPLAINT

Hong ("Henry") Liu ("Mr. Liu" or "Plaintiff"), by and through his undersigned attorneys, files this Complaint under section 523 of title 11, United States Code (the "Bankruptcy Code") objecting to the dischargeability of a prepetition debt owed by Defendant Yueting Jia ("Debtor") to Plaintiff, and seeking an order denying the dischargeability of that debt in the Debtor's chapter 11 case, and in support alleges as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff has filed a proof of claim (the "Proof of Claim") against the Debtor in an unliquidated amount (the "Claim").  The Claim is based on amounts owed by Debtor to Plaintiff pursuant to a Director Compensation Agreement, dated February 2, 2018 (the "Director Agreement"), between the Debtor and Plaintiff.

2.      Plaintiff was fraudulently induced by the Debtor to resign his equity partnership at a U.S. national law firm and join Smart King Limited ("Smart King"), Smart Technology Holdings Ltd. (f/k/a FF Global Holdings Ltd.) ("FF Global") and Faraday & Future, Inc. ("Faraday," and collectively with Smart King and FF Global, "FF") as Global General Counsel, Global Chief Administrative Officer and Senior Board Member.  The Debtor falsely represented that FF had received a $2 billion investment from Evergrande Health Industry Group Ltd. (together with its affiliates, "Evergrande"), through its affiliate, Smart Season Limited.

3.      From February 15, 2018 to February 11, 2019, Plaintiff was employed by FF.  On February 11, 2019, Plaintiff was terminated by FF without any legitimate basis, triggering Plaintiff's immediate right to compensation under the Director Agreement.

4.      The debt owed to Plaintiff under the Director Agreement is nondischargeable, as detailed in this Complaint.

## JURISDICTION AND VENUE

5.      This is a core proceeding under 28 U.S.C. §157(b)(2)(I) and is brought pursuant to 11 U.S.C. §§ 523(a) and Rule 4007 of the Federal Rules of Bankruptcy Procedure.

6.      Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§ 157, 1334, and 523.

7.      Venue over this action properly lies in this Court pursuant to 28 U.S.C. §1409(a) because this Complaint arises in Debtor's chapter 11 bankruptcy case.

8.      If the Court should find that this action is not a core proceeding, Plaintiff consents to entry of final judgment by the Court.

## THE PARTIES

9.      Mr. Liu is a resident of the State of New York and is a creditor of the Debtor.  On January 6, 2020, Plaintiff timely filed the Proof of Claim against the Debtor in an unliquidated amount.

10.     The Debtor is the debtor in the Bankruptcy Case.  Upon information and belief, the Debtor is a resident of the State of California.

## FACTUAL ALLEGATIONS

**Mr. Liu's Law Practice**

11.     Mr. Liu is a New York-based attorney with decades of experience in global legal, business and financial industries.  He is one of the most experienced lawyers in New York in handling complex cross-border matters involving the People's Republic of China ("PRC"). Since 1991, Mr. Liu has been admitted to practice in New York.

12.     Between 1995 and 2000, Mr. Liu served as General Counsel and Director-General of the China Securities Regulatory Commission ("CSRC"), the national securities regulator in the PRC. At the CSRC, Mr. Liu played a prominent role in reforming the PRC securities industry, including leading a CSRC team that drafted and enacted the PRC's first securities law in 1998.

13.     In the early 2000's, Mr. Liu served as a managing director of investment banking at the New York based Donaldson, Lufkin & Jenrette which was later merged into Credit Suisse First Boston, dividing his time between New York and Hong Kong.

14.     Between 2005 and April 2014, Mr. Liu served in senior positions in the New York offices of global law firms, including as a partner with Nixon Peabody LLP, DLA Piper LLP, and Pillsbury Winthrop Shaw Pittman LLP.

15.     Between April 2014 and February 2018, Mr. Liu was an equity partner at Mayer Brown LLP in its New York office.

16.     At Mayer Brown, Mr. Liu developed one of the most active and successful China and Asia-related practices in the United States.  Mr. Liu's client base included numerous financial giants in the PRC, as well as leading companies in a wide range of industries in the PRC including transportation, infrastructure, manufacturing, insurance, and private equity.

**The Debtor Fraudulently Induces Mr. Liu To Resign His Partnership**

17.     Between October 2017 and mid-February 2018, at the pinnacle of his success, Mr. Liu was fraudulently induced to leave his prestigious and lucrative equity partnership at Mayer Brown, and his roster of blue-chip clients, and take up a position with Faraday.

18.     Faraday had been seeking for years to develop and market a viable electric car, without success.  Smart King, Faraday's holding company, has no material operations.

19.     The Debtor knew that hiring Mr. Liu, a globally respected professional with decades of experience, would bolster Faraday's credibility with stakeholders.

20.     At all relevant times, Faraday and Smart King were controlled by the Debtor, the founder, principal shareholder and chief executive officer of these entities.  The Debtor exercises total control of Faraday and its affiliates through a close network of family members and lieutenants in his inner circle.

21.     On October 17, 2017, the Debtor through one of his lieutenants invited Mr. Liu from New York to meet the Debtor for the first time, at Faraday's California office.  The Debtor invited Mr. Liu to join Faraday as a senior officer and director.  In the ensuing months, the Debtor and his associates sought to induce Mr. Liu to leave his lucrative law practice and join Faraday.

22.     The Debtor knew that Mr. Liu would not leave his successful practice in New York unless he could induce him to believe that Faraday would offer a package of cash and equity compensation that was superior to what Mr. Liu was earning at Mayer Brown, and that Faraday had actually raised sufficient capital to make good on its compensation commitments to Mr. Liu.  Further, given that the Debtor sought to lure Mr. Liu with promises of a substantial equity stake, it was imperative for the Debtor and Faraday to provide supposed "evidence" of the value of the equity that Mr. Liu would be granted, particularly given that Faraday was a privately held start-up company with no revenues and had not begun production.

23.     On October 25, 2017, the Debtor caused one of his associates to send Mr. Liu a purported estimate of the value of the Smart King options (representing 2% of the total equity of Smart King) that would be issued to Mr. Liu if he joined Faraday.  According to the estimate, Mr. Liu's options would be worth approximately $43 million based on a "Series A Value."  This was prior to the Evergrande transaction described below.

24.     Beginning in or around January 2018, knowing how critical it was to induce Mr. Liu to believe in Faraday's financial viability and the value of its equity, the Debtor represented to Mr. Liu that Evergrande, a major conglomerate in the PRC, had invested $2 billion in Smart King in a Series A offering.  This private securities transaction was not publicly disclosed at the time, and thus Mr. Liu had no way of verifying the Debtor's representation.

25.     In January 2018, during meetings and teleconferences, the Debtor represented to Mr. Liu that on November 30, 2017, Evergrande completed its $2 billion Series A investment in Smart King, which valued Smart King at $4.5 billion, and that Smart King had actually received the $2 billion.  The Debtor also emphasized that since Smart King was valued at $4.5 billion, each one percent of Smart King's equity was worth $45 million.

26.     On January 10, 2018, and again between January 22 and January 24, 2018, Mr. Liu met the Debtor and his team at Faraday's headquarters premises in California.  During multiple meetings on these dates, the Debtor touted the successful completion of the Series A investment from Evergrande, including Smart King's receipt of Evergrande's $2 billion investment.

27.     During these meetings, Mr. Liu repeatedly requested to view the Series A documents and attempted to inquire about the details of the Evergrande transaction.  However, the Debtor refused to provide Mr. Liu with the relevant documentation and details of the Evergrande transaction, citing confidentiality obligations to Evergrande, but assured Mr. Liu that the Series A transaction was handled by reputable international law firms including Sidley Austin LLP and that Mr. Liu could be assured of the validity and quality of the transaction.

28.     Unbeknownst to Mr. Liu, the representations made by the Debtor were false.  The Series A investment was not "completed."  As the Debtor knew (and deliberately concealed from Mr. Liu), Smart King never received $2 billion.  Indeed, Evergrande invested only $300 million in Smart

King on or about November 30, 2017, and would invest only $800 million by mid-2018 before terminating its funding relationship with Smart King.

29.     The Debtor's representation that Smart King received a $2 billion investment was a highly material fact that Mr. Liu relied upon in deciding whether to accept Faraday's employment offer and, critically, in assessing the value of the equity compensation that the Debtor offered to him. Mr. Liu reasonably believed that Faraday's prospects for success (and the value of the equity of Smart King, Faraday's parent) were significantly enhanced by Evergrande's $2 billion investment.

**The Employment Agreement**

30.     Unaware that the Debtor had fraudulently misrepresented the fact that Smart King had received $2 billion from Evergrande, on or about January 25, 2018, Mr. Liu entered into the Employment Agreement with Faraday, Smart King, and certain of their affiliates. (A copy of the agreement is attached hereto as Exhibit A).

31.     The Employment Agreement provides that Mr. Liu would serve as Global Chief Administrative Officer, Global General Counsel and Global Senior Advisor, as well as serving as a senior board member.

32.     Further, in the Employment Agreement, FF agreed to pay Mr. Liu a $3 million signing bonus plus annual compensation of $1 million in each of the first five years of his employment.   FF further agreed to grant Mr. Liu 20 million shares of FF, which represented two percent of FF's total equity prior to its Series A round, with the shares to be issued (at Mr. Liu's election) in the form of restricted stock or options, and that this two percent equity interest (to the extent not already vested) would become immediately and fully vested to Mr. Liu upon any early termination within the guaranteed employment term with FF.  Ex. A, at p. 2.   FF also agreed that Mr. Liu would be entitled to participate in all benefit programs at Faraday at the same level as all senior executives, including being covered by existing directors' and officers' insurance policies.

33.     The Employment Agreement further represented (consistent with what the Debtor falsely told Mr. Liu in January 2018) that FF "successfully completed its first closing of Series A financing in December 2017." This representation was false and misleading because Evergrande's $2

billion investment in Smart King's Series A had not "completed" and, as of the date of the agreement, FF had received only $300 million from Evergrande.

**The Director Agreement**

34.     On or about February 2, 2018, as a further inducement to Mr. Liu to leave his New York law practice and join Faraday, the Debtor signed and entered into the Director Compensation Agreement with Mr. Liu.   (A copy of the agreement is attached hereto as Exhibit B).

35.     In the Director Agreement, the Debtor falsely represented that "[Smart King] successfully completed its Series A financing in December 2017."  Further, the Debtor represented that Mr. Liu would be "fully covered by [Smart King] with executive indemnifications to the extent set forth in [Smart King's] standard form of director indemnification agreement" without disclosing the fact that Smart King did not maintain a directors' and officers' insurance policy.

36.     Further, in the Director Agreement, the Debtor personally agreed to pay Mr. Liu, upon certain triggering events ("Triggering Events"), a cash amount equal to 1% of the value of Smart King shares as calculated prior to its Series A offering.  The Debtor has a substantial personal stake in Smart King.  Indeed, the Debtor has economic rights to 40.8% of Smart King's equity, which is currently owned by FF Top Holding Ltd. ("FF Top").  *See* Debtor's Second Amended Disclosure Statement (the "Disclosure Statement"), dated January 28, 2020 (Dkt. No. 262 at p. 2).

37.     The Director Agreement provides in relevant part:

> [T]he [Debtor] agrees to pay [Mr. Liu] a cash amount . . . equal to the cash value of shares equal to, for the only purpose of calculating and computing such cash amount, 1% of [Smart King's] total equity shares pre Series A dilution, namely 10,000,000.00 equity shares representing 1% of the total and all of 1,000,000,000.00 equity shares of [Smart King] pre-Series A (the "Shares" or "Stocks") (the "Director Compensation"), upon the reasonably earliest possible and available cash realization of the Shares including the sooner happening of one or more of the following events: (a) a firm commitment underwritten public offering of [Smart King's] stock (a "Qualified IPO"), and the sale of a sufficient number of [FF Top's] shares of [Smart King] in or as soon as reasonably practicable following such Qualified IPO for an amount greater than or equal to the Director Compensation; (b) any transactions including, but not limited to, merger, acquisition, sale or disposal of assets other than an IPO, resulting in cash available to [FF Top] for the Director Compensation; or (c) a change of control in [Smart

King] resulting in cash available to [FF Top] for the Director Compensation.

Ex. B, at ¶ 1.

**Mr. Liu Resigns His Law Partnership and Begins Work at Faraday**

38.     In early February 2018, Mr. Liu resigned from his partnership at Mayer Brown, in reliance on the Debtor's false representations as well as the promises that the Debtor made in the Director Agreement.

39.     On February 15, 2018, Mr. Liu began working at Faraday.

40.     Between mid-February 2018 and October 2018 (when, as described below, he began to be stripped of his authority), Mr. Liu performed numerous tasks in connection with managing the legal and administrative functions of FF, including building up the legal team, drafting and implementing policies on technology and intellectual property protection and other critical areas, and overseeing a wide range of sensitive regulatory and compliance matters.

**Mr. Liu Learns of Serious Workplace Violations**

41.     Beginning shortly after assuming his duties at Faraday, Mr. Liu observed illegal, discriminatory, and outrageous behavior by the Debtor and his clique.  Mr. Liu repeatedly advised the Debtor and his associates, through direct and open communications, to cease their misconduct.  Mr. Liu also worked with and directed Faraday's legal department to issue appropriate internal communications, and to draft and adopt policies and procedures designed to ensure compliance with applicable laws.  However, the Debtor and his clique largely ignored these efforts.

42.     Thus, for example, on numerous occasions, the Debtor brazenly announced his preference for working with younger employees, and that Faraday should selectively hire younger employees because they fit more of a "start-up image" and "an entrepreneurial environment," and that older employees are not desirable.   In response, at Mr. Liu's direction, the legal department worked to strengthen and update human resources policies, including with respect to preventing discrimination in hiring.

43.     In mid-2018, several employees filed internal complaints alleging sexual harassment and a hostile work environment at Faraday, including allegations that employees were pressured to

hire attractive women at the Debtor's insistence. In response, at Mr. Liu's direction, the legal department took steps to investigate complaints, enforce workplace policies, and conduct management training.

44.      Mr. Liu was also concerned by reports that the Debtor was using Faraday as an immigration farm to obtain U.S. visas for numerous PRC nationals. In May 2018, the U.S. Citizenship & Immigration Services Division of the Department of Homeland Security conducted an on-site inspection of Faraday's offices in Gardena, Los Angeles. Mr. Liu reminded the Debtor of the importance of complying with U.S. immigration laws. Further, at Mr. Liu's direction, the legal department took steps to ensure compliance with immigration law and to cooperate with the U.S. authorities.

45.      The Debtor and his coterie engaged in a pattern of bullying, threats, and harassment. Thus, for example, the Debtor made clear to senior management that if they dared to express any views that conflicted with the Debtor's views, he would fire and sue them. The Debtor publicly scolded Faraday co-founder Nick Sampson before Faraday's management team, calling him an idiot. The Debtor and a close lieutenant also threatened Mr. Sampson and Butch Darrow, Faraday's Vice President of Quality.

46.      On October 18, 2018, the Debtor sent an email to Faraday employees announcing mass layoffs. In his email, the Debtor claimed that Faraday was eliminating untalented or undesirable employees. Significantly, most (if not all) PRC nationals at Faraday who were applying for U.S. work visas were not laid off. Mr. Liu was not consulted on the content of the Debtor's email or on the manner in which the layoff was conducted.

47.      During this time period, Mr. Liu actively instructed the legal department to issue memoranda and other communications urging the Debtor and his clique to comply with applicable laws relating to, among other things, employee layoffs, labor codes, fiduciary duties, immigration, financial controls, and privacy laws (so that the Debtor and his clique would not secretly record employee activities). These memoranda were all disregarded by the Debtor and his clique.

////

**The Debtor Orchestrates Mr. Liu's Termination**

48.     In and around late October and late November 2018, on numerous occasions the Debtor threatened to fire Mr. Liu if Mr. Liu did not capitulate and carry out the Debtor's orders, even if such orders violated applicable law or were not in Faraday's best interest.  The Debtor's cronies made similar threats.

49.     In early November 2018, Mr. Liu requested a board meeting to discuss a number of issues, including Faraday's compliance with applicable law related to employee layoffs.

50.     In January 2019, Mr. Liu wrote to the Debtor directly, documenting the egregious campaign of retaliation being orchestrated by the Debtor and his junta.  Faraday, at the Debtor's behest and paralyzed by the Debtor's iron grip, never conducted any investigation of the numerous legal and compliance issues identified by Mr. Liu.

51.     On February 4, 2019, the Debtor again verbally attacked Mr. Liu, ridiculing, humiliating and abusing Mr. Liu with fabrications and insults.

52.     On February 11, 2019, the Debtor told Mr. Liu that he was being terminated.   Faraday terminated Mr. Liu on that date.

53.     In its written notice of termination, Faraday did not indicate any cause for Mr. Liu's termination.  After terminating Mr. Liu, Faraday failed to pay him the cash and equity compensation owed to him under the Employment Agreement.[1]

**Mr. Liu's Right to Compensation under the Director Agreement Has Been Triggered**

54.     The Debtor owes a debt to Mr. Liu based on amounts due under the Director Agreement.

55.     As set forth in the Proof of Claim and described herein, as of the Filing Date, one or more Triggering Events have occurred which entitle Plaintiff to be paid the full amount of the Claim. The Triggering Events include one or more of the following:

- The receipt by Smart King between February and May 2018 of approximately US $500 million from Season Smart Limited, a subsidiary of Evergrande. This is a triggering Event because it

---

[1] Mr. Liu has filed a separate lawsuit against Faraday and Smart King arising from their breaches of the Employment Agreement, among other claims.  *See Liu v. Faraday & Future Inc. et. al., No. 20-cv-00019 (SDNY) (GBD).*

is a "transaction," as that term is used in the Director Agreement, resulting in cash available to FF Top, or its affiliates, to pay the Claim;

- The transfer, in or about July 2018, by the Debtor of 100% of the membership interests in Pacific Technology Holding LLC, the indirect sole shareholder of all of FF Top's shares in Smart King, to Lian Bossert. This is a Triggering Event because it represents a "change of control," as that term is used in the Director Agreement, in Smart King resulting in cash available to FF Top, or its affiliates, to pay the Claim;

- The loan made by Ever Trust LLC to FF in or about June 2019 in the approximate amount of US $16.5 million. *See* Disclosure Statement, at p. 27. This is a Triggering Event because it is a "transaction," as that term is used in the Director Agreement, resulting in cash available to FF Top, or its affiliates, to pay the Claim;

- The loans made by partners of FF or its affiliates on or about June 26, 2019 to FF Global in the amount of approximately US $15.3 million. *See* Disclosure Statement, at p. 27. This is a Triggering Event because it is a "transaction," as that term is used in the Director Agreement, resulting in cash available to FF Top, or its affiliates, to pay the Claim;

- The joint venture agreement, dated March 24, 2019, between Faraday and The9 Limited to explore opportunities in the Chinese electric vehicle market. Faraday has a 50% interest in the joint venture and The9 Limited agreed to make a capital contribution of up to US $600 million in three equal installments, subject to the terms of the joint venture agreement. *See* Disclosure Statement, at p. 94, and Exhibit C to the Disclosure Statement.  This is a Triggering Event because it is a "transaction," as that term is used in the Director Agreement, resulting in cash available to FF Top, or its affiliates that are under common ownership and control with FF Top, to pay the Claim;

- The senior bridge loan made, on or about April 30, 2019,  to Faraday by Birch Lake Fund Management LP, under which Birch Lake Fund Management LP agreed to provide a US $225 million senior bridge loan to Faraday. Part of the bridge loan was utilized to establish a "vendor trust" through which Faraday would secure past due payables of up to US $150 million. *See* Disclosure Statement, at p. 37-38, and Exhibit C to the Disclosure Statement. This is a Triggering Event because it is a "transaction," as that term is used in the Director Agreement, resulting in cash available to FF Top, or its affiliates that are under common ownership and control with FF Top, to pay the Claim;

- The purchase and sale agreement, dated February 4, 2019, through which FF sold its headquarters in Gardena, California to Atlas Capital Investors V, LP. for US $29 million. *See* Exhibit C to the Disclosure Statement.  This is a Triggering Event because it is a "transaction," as that term is used in the Director Agreement, resulting in cash available to FF Top, or its affiliates that are under common ownership and control with FF Top, to pay the Claim.

Further, due to the secrecy and manipulative practices of the Debtor and Faraday in their business and funding activities, other undisclosed triggering events may exist.

56.     The Director Agreement provides that unless Mr. Liu is terminated for "the specific cause of a serious breach of fiduciary duty" as "finally adjudicated" by a U.S. court, then any and all compensation due under the agreement would be "immediately and fully vested" upon his termination. Ex. B, at ¶ 3.  Because Mr. Liu was not terminated for cause, all compensation due under the Director Agreement was immediately and fully vested upon Mr. Liu's termination.

57.     As set forth in the Proof of Claim, as of the Filing Date, the cash amount due to Mr. Liu depends on the value of Smart King shares, whose value remains to be determined.  Significantly, in late 2017 and early 2018 Debtor represented that a 1% equity interest in Smart King was worth a minimum of $45 million.  In his Disclosure Statement, the Debtor provided an illustrative range of values for Smart King shares of between US $5 billion and US $21 billion.  *See* Disclosure Statement, at p. 34.

58.     Because the value of Smart King's shares is presently unknown, the exact amount of Plaintiff's Claim is undetermined and unliquidated.   The exact amount of the Claim will be determined and established when the value of the Shares is determined by this Court or through some other method.

**Mr. Liu's Claims Are Non-Dischargeable**

59.     By fraudulently inducing Mr. Liu to resign from his New York partnership at Mayer Brown, Mr. Liu lost a lucrative equity partnership interest at a global law firm.  He also lost the opportunity to become a retired partner at Mayer Brown, which carries significant economic benefits.

60.     Further, Mr. Liu was induced to abandon extensive client relationships, which he transitioned to colleagues.  Since being terminated by Faraday, Mr. Liu has not been offered any comparable positions at any major law firms because he is perceived to have lost many of these client relationships.

61.     Debtor's conduct, representations and statements demonstrate that the Claim owed to Plaintiff was based upon and obtained by false pretenses, false representations, or actual fraud, or alternatively, by a materially false written statement respecting Faraday's or its affiliates financial condition.  Accordingly, the debt owed by Debtor to Plaintiff is non-dischargeable, and Plaintiff is

entitled to an award of damages in an amount according to proof, plus attorneys' fees, costs incurred, interest, and such other relief as the Court deems just and proper.

## COUNT I

### (Non-dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(2)(A))

62.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

63.     The Debtor made false statements and representations to Plaintiff with the intent to induce Plaintiff to enter into the Director Agreement.

64.     The Debtor's statements, representations and acts described above constitute conduct by Debtor used to obtain services from Plaintiff by false pretenses, false statements, or actual fraud.

65.     As set forth above, the Plaintiff's Claim against the Debtor is for a debt for money, property, services, or an extension, renewal, or refinancing of credit, obtained by false pretenses, a false representation, or actual fraud, and is a non-dischargeable debt under Bankruptcy Code section 523(a)(2)(A).

## COUNT II

### (Non-dischargeability of Debtor Pursuant to 11 U.S.C. § 523(a)(2)(B))

66.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

67.     Pursuant to 11 U.S.C. § 523(a)(2)(B), a debt in which a debtor obtains money or services by a statement in writing that is materially false respecting an insider's financial condition, on which the creditor reasonably relied, and which the debtor caused to be published with intent to deceive is a non-dischargeable debt.

68.     As set forth above, the Debtor and Faraday, an insider of the Debtor, or Faraday's affiliates who are also insiders of the Debtor, obtained services from Plaintiff through written materially false statements set forth in the Employment Agreement and the Director Agreement respecting Faraday's, and/or its affiliates, financial condition on which Plaintiff reasonably relied.

69.     Consequently, the Debtor's debt owed to Plaintiff is one for services or money obtained by materially false written statement regarding an insider's financial condition, on which Plaintiff

1  reasonably relied, and which the Debtor made with intent to deceive, and is a non-dischargeable debt.

2      70.      As a result of Debtor's statements, representations and acts described above,

3  Plaintiff's Claim against the Debtor is not dischargeable pursuant to Bankruptcy Code section

4  523(a)(2)(B).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for entry of judgment against the Debtor, as follows:

a.  for an order awarding damages to Plaintiff and determining the amount of the
    Claim owed to Plaintiff according to proof;

b.  for an order determining that the Claim owed by Debtor to Plaintiff is non-
    dischargeable in the Bankruptcy Case, in any future bankruptcy case involving
    the Debtor, including any chapter 7 case, filed by or against the Debtor;

c.  for attorneys' fees and costs herein incurred; and

d.  for such other and further relief as this Court may deem just and proper.

DATED:  February 4, 2020        THE LAW OFFICES OF BENJAMIN TAYLOR
                                A Professional Corporation

                                By:_____
                                    BENJAMIN TAYLOR
                                    Attorneys for Plaintiff
                                    HONG LIU

DATED:  February 4, 2020        SEIDEN LAW GROUP LLP

                                By:_____
                                    AMIAD KUSHNER
                                    Attorneys for Plaintiff
                                    HONG LIU

# Exhibit A

Confidential & Privileged

Employment Agreement

Between FF and HL

(January 25, 2018)

This Employment Agreement ("Agreement") sets forth the terms and condition of employment of Hong Liu (aka (Henry) Hong Liu, "HL") at FF Global Holdings Ltd., and Smart King Limited which owns 100% of and controls such entities including, without limitation, FF Global Holdings Ltd., Faraday & Future Inc., LeSEE (in VIE Structure), City Sky Limited, d/b/a Faraday and their successors, assignees and transferees ("FF"). These Terms ("Terms") supersede and replace any and all previous agreements and other agreements as may be specifically referred to herein, between the parties. If any provision of these Terms is ineffective in whole or in part, the remainder of the Terms shall remain effective.  The Terms shall be constructed in accordance with and governed by the laws of the State of California without regard to otherwise governing principles of conflicts of law.

Position & Duties:

FF shall appoint HL Senior Board Member of FF Global Board; Global Chief Administrative Officer, with the Chinese translation of 全球行政总裁, or other similar and comparable title as may be further discussed and agreed, and concurrently the Global General Counsel at HL's choice, and the Global Senior Advisor of FF, directly reporting to FF's CEO. FF shall give HL adequate authority and support in performing his duties. HL's duties and responsibilities shall be commensurate with such positions, and subject to typical exceptions for serving on other civic/charitable/corporate boards with no direct conflict of interest with FF and for managing personal investments.

Term:

HL shall commence as soon as practical and expects to be no later than February 1, 2018 or other days as may be mutually agreed, based on agreed Terms. For formality purpose only, FF may or may not ask HL to sign the standard form of employment letter ("Offer Letter") applicable to all executives and employees of FF in U.S.A. when joining the company, however, FF has expressed agreed and specifically acknowledged that the Letter and all its contents shall be superseded and overridden by this Agreement. FF shall guarantee HL's employment and base salaries as provided in the Terms for five years except for HL decides to leave FF at his own. Thereafter such employment shall continue at the then same levels of responsibilities and compensation including the continued annual amount of signing bonus and other benefits as provided in this Agreement until terminated by either party, upon 90 days advance notice, pursuant to the Terms.

1

Confidential & Privileged

### Base Salaries:

FF shall pay HL a minimum annual base salary of $1,000,000.00, in semi-monthly (bi-weekly) installments, for five years. If HL is terminated by FF for any reason during the five year term he will be entitled to receive any remaining portion of the five years of base salaries not yet paid in a lump sum. Base salary will be reviewed on an annual basis for increases in accordance with the review process for senior level executives of FF.

### Signing Bonus:

FF shall pay HL a signing bonus of $3,000,000.00, payable in five equal installments, with the first installment paid upon the signing of the Agreement and each of the remaining installments paid at each of the following four anniversary of HL's start of employment at FF and paid in lump sum in the event of an early termination by FF during the five year guaranteed employment term.

### Bonus Opportunity:

FF shall award HL discretionary annual bonus based on annual review. Annual bonus will be reviewed on an annual basis for increases in accordance with the review process for senior level executives of FF. FF shall give HL access to special Bonus based on a percentage of overall transactions, including successful equity and debt financing, China Joint Venture, and other special projects and important tasks, etc., in which HL plays one of the leading roles of the project group and makes substantial contributions.

### Equity Grants:

FF shall entitle HL to FF's long-term and short-term incentives. FF shall grant HL at minimum cost required by law and outright, 2% of FF's total equity shares pre Series A dilution in the form of restrictive stocks or equity option as HL may select based on any of FF's available equity grant forms to select from, namely 20,000,000.00 equity shares representing 2% of the total and all of 1,000,000,000.00 equity shares of FF pre Series A, as FF has represented and warranted, with the FF established and standard equity share or option vesting schedule and any of FF's earliest available vesting schedules as HL may select and with adequate consideration of tax benefits available to HL. Any and all of the remaining unvested portion of such 2% of the total shares shall become immediately and fully vested to HL upon any early termination by FF of HL's employment within the guaranteed employment term with FF.  Such an early termination can only be effectuated based on the specific cause of a serious breach of fiduciary duty to FF as a senior executive of FF after fully adjudicated against HL by a competent court in the United States, and HL will be fully covered by FF with executive indemnifications. FF has represented that it had successfully completed first closing of Series A financing in December 2017, which is subject to CFIUS approval and it is possible that the global corporate structure of FF may be adjusted in compliance with any decisions to be concluded by CFIUS, which FF represents and warrants that it will ensure that provisions concerning HL as contained in this Agreement shall not be adversely affected.   FF has further

2



Confidential & Privileged

represented that there are no multiple classes of shares with different rights and values offered to employees except the Founder (Yueting Jia, "YT" himself).  HL will act in concert with the Founder under the circumstances permitted by law.

Benefits/PTO:

FF shall entitle HL to participate in all benefit plans and programs at the same level with all senior level executives of FF, including, without limitation, corporate housing, transportation, retirement, welfare, vacation and PTO, insurances including health, life, and D&O. FF shall honor and adopt all employee and executive friendly best practices in favor of HL as a valued senior executive of FF, with regard to severance payments, change of control, parachute payments, tax treatments and any other customary executive compensation provisions. HL is entitled to indemnification from FF on terms no less than any other executives and employees.

Relocation:

FF shall pay for all HL's reasonable relocation costs and expenses as a senior executive, including, without limitation, family house-hunting trips, moving and storage of household goods, settling in allowances, interim living etc.

Survivor Benefits:

HL is entitled to death benefits if he dies during the five year term and during his employment at FF, including two year of base salary for his surviving spouse and children. Upon his death vesting schedules for his unvested equity interests shall have a two-year acceleration  and all vested equity interests will pass to his surviving spouse and his children with adequate consideration of tax benefits to his survivors.

Signed by,

Signature: _____
For & authorized by & on behalf of FF
Position:
Printed Name: Teddy Kang

Signed by,

Signature: _____
Hong Liu
Printed Name: Hong Liu

Jointly signed and acknowledged by:

Signature: _____
Board Director, FF
Jiawei Wang

3

# Exhibit B

DIRECTOR COMPENSATION AGREEMENT

 This Director Compensation Agreement (this "Agreement") is made and entered into as of the 2nd day of February, 2018, by and between Yueting Jia, the indirect sole shareholder of Founder HoldCo (as defined below) (the "Founder"), and Hong Liu (aka (Henry) Hong Liu, the "Appointee") (separately, a "Party" or collectively, the "Parties"), as a legally bound agreement on the Parties and on their successors, assignees and transferees.

 1. FF Top Holding Ltd. ("Founder HoldCo") owns an aggregate amount of 600,000,000 Class B preferred shares of Smart King Limited (the "Company"), which in turn owns 100% of entities including, without limitation, FF Global Holdings Ltd, Faraday & Future, Inc., LeSee entities (in VIE form), City of Sky Limited (d/b/a Faraday) and their successors, assignees and transferees.  The Parties have entered into this Agreement pursuant to which: (i) the Founder will cause Founder HoldCo to appoint the Appointee, and the Appointee accepts such appointment, to serve as a director with all D&O insurance and indemnifications on the board of directors of the Company and (ii) in exchange for the Appointee's service as a director on the board of directors of the Company, the Founder agrees to pay the Appointee a cash amount, or other means of payment as may be mutually agreed by Appointee and the Founder, equal to the cash value of shares equal to, for the only purpose of calculating and computing such cash amount, 1% of the Company's total equity shares pre Series A dilution, namely 10,000,000.00 equity shares representing 1% of the total and all of 1,000,000,000.00 equity shares of the Company pre Series A (the "Shares" or "Stocks") (the "Director Compensation"), upon the reasonably earliest possible and available cash realization of the Shares including the sooner happening of one or more of the following events: (a) a firm commitment underwritten public offering of the Company's stock (a "Qualified IPO"), and the sale of a sufficient number of Founder HoldCo's shares of the Company in or as soon as reasonably practicable following such Qualified IPO for an amount greater than or equal to the Director Compensation; or (b) any transactions including but not limited to, merger, acquisition, sale or disposal of assets other than an IPO, resulting in cash available to Founder HoldCo for the Director Compensation; or (c) a change of control in the Company resulting in cash available to Founder HoldCo for the Director Compensation ("Event" or "Events").   The vesting of the Director Compensation is subject to the same vesting conditions as provided and agreed in the Employment Agreement between the Appointee and the Company dated January 25th, 2018 ("EA").

 2. The Founder represents that the Company successfully completed its Series A financing in December 2017. It has been acknowledged by the Parties that the Director Compensation is for a full and accepted consideration upon signing of this Agreement. It is the good faith belief and genuine intention of the Parties that this Agreement is to promote and safeguard the interests of all of the Company's shareholders and stakeholders.

 3. This Agreement is effective and binding upon the signing.  The Parties agree that the delivery of the Director Compensation by the Founder to the Appointee shall be in the form of wire transfer of available funds after the conditions in the preceding sentence have been satisfied.  The Founder's performance of its obligations under this Agreement are in all respects subject to the restrictions set



forth in that certain Shareholders Agreement, dated as of November 30, 2017, as amended, by and among the Company, Founder HoldCo, the Founder and Season Smart Limited (the "Agreement"). It is further understood and agreed among the Parties that the demand by the Appointee for the delivery of the Director Compensation shall be contingent upon the satisfaction of the conditions set forth in the preceding paragraph. If the Appointee decides to leave the Company at his own will during his employment term as provided in the EA or his employment at the Company is terminated by the Company during such a term based on the specific cause of a serious breach of fiduciary duties to the Company as a senior executive of the Company after finally adjudicated against the Appointee by a competent court in the United States ("Departure or Termination") (the Appointee will be fully covered by the Company with executive indemnifications to the extent set forth in the Company's standard form of director indemnification agreement), any remaining unvested portion of the Director Compensation at the time when such Departure or Termination effectuates will be automatically forfeited. If the Appointee leaves the Company without such a Departure or Termination, any and all of the remaining unvested portion of the Director Compensation shall become immediately and fully vested to the Appointee as is similarly provided in the EA. Any delay to enforce the terms of this Agreement and any delay to act on a breach of its term by the Appointee does not constitute a waiver of those rights.

4.  The terms of this Agreement are confidential between the parties and shall not be disclosed to anyone else except mutually agreed between Founder and Appointee in writing or electronic notice.

5.  If any provision of this Agreement is ineffective in whole or in part, the remainder of this Agreement shall remain in effect.  This Agreement is binding on all Parties by virtue of the conduct of both parties and in spite of any defect or error in the formality of its execution.

6.  The rights, benefits, liabilities and responsibilities contained within the terms of this Agreement are not assignable by any Party with the prior written agreement of the other Party.

7.  The Parties agree that this Agreement shall be governed and construed in accordance with the laws of the State of California, and that any dispute arising out of or related to this Agreement shall be resolved exclusively in the state or federal courts located in Los Angeles, California.

8.  The Parties hereby agree that the Director Compensation payment provisions in this Agreement shall become fully effective at the sooner of the removal and nonexistent of any current restrictions on the Founder or the Found Holdco to Transfer all or any part of any interest in any Equity Securities, or the happening of any of the Event.

[*The remainder of this page has been intentionally left blank.*]



IN WITNESS WHEREOF, the undersigned have hereunto caused this Director Compensation Agreement to be executed as of the date first set forth above.

FOUNDER

Yueting Jia

APPOINTEE

Hong Liu (aka (Henry) Hong Liu)