1   **SMILEY WANG-EKVALL, LLP**
    Lei Lei Wang Ekvall, State Bar No. 163047
2   *lekvall@swelawfirm.com*
    Robert S. Marticello, State Bar No. 244256
3   *rmarticello@swelawfirm.com*
    3200 Park Center Drive, Suite 250
4   Costa Mesa, California 92626
    Telephone:    714 445-1000
5   Facsimile:    714 445-1002

6   Attorneys for Defendant Yueting Jia

7

8                 **UNITED STATES BANKRUPTCY COURT**

9                 **CENTRAL DISTRICT OF CALIFORNIA**

10                    **LOS ANGELES DIVISION**

11  In re                              Case No. 2:19-bk-24804-VZ

12  YUETING JIA,                       Chapter 11

13                        Debtor.      Adv No. 2:20-ap-01022-VZ

14  ───────────────────────────        **REPLY TO PLAINTIFF'S OPPOSITION
                                       TO MOTION TO DISMISS COMPLAINT**
15  HONG LIU, an individual,           **UNDER FEDERAL RULE OF CIVIL
                                       PROCEDURE 12(b) FOR FAILURE TO**
16                        Plaintiff,   **STATE A CLAIM**

17          v.                         **Hearing**
                                       **Date:      May 7, 2020**
18  YUETING JIA, an individual; and DOES 1   **Time:      1:30 p.m.**
    through 20, inclusive,             **Place:     Courtroom 1368**
19                                                 **United States Bankruptcy Court**
                          Defendant.              **Edward R. Roybal Federal**
20                                                 **Building**
                                                   **255 E. Temple Street**
21                                                 **Los Angeles, CA  90012**

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................1

II.     THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE PLAINTIFF
        HAS NOT ESTABLISHED A DEBT UNDER STATE LAW ...............................3

III.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE PLAINTIFF'S
        ALLEGED DEBT IS NOT RECOVERABLE FOR FRAUD...................................5

IV.     THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE PLAINTIFF
        HAS FAILED TO STATE A CLAIM UNDER EITHER SECTION 523(a)(2)(A)
        OR SECTION 523(a)(2)(B) ...............................................................................10

        A.      The Plaintiff Failed to State a Claim under Section 523(a)(2)(A) ...........10

        B.      The Plaintiff Failed to State a Claim under Section 523(a)(2)(B) ...........13

V.      THE COMPLAINT SHOULD BE DISMISSED WITHOUT LEAVE TO AMEND ........15

VI.     CONCLUSION ..................................................................................................16

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

2822183.2

i

TABLE OF CONTENTS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

# **TABLE OF AUTHORITIES**

**Page**

## **CASES**

*Alliance Mortgage Co. v. Rothwell*, 10 Cal.4th 1226, 1240 (1995) ........................ 5

*Banks v. Gill Distribution Centers, Inc.*, 263 F.3d 862, 868 (9th Cir. 2001) ........................ 3

*Christiansen v. Roddy*, 186 Cal. App. 3d 780, 790 (1986) ........................ 5

*EduMoz, LLC v. Republic of Mozambique*, 2105 WL 13697385 at *15 (C.D. Cal. 2015) ........... 5

*Grogan v. Garner*, 498 U.S. 279, 283 (1991) ........................ 3

*Higgins v. Disney/ABC Int'l Television, Inc.*, 2009 WL 692701, at *8 (Cal. Ct. App. 2009) ........ 14

*In re Barrack*, 217 B.R. 598, 606 & 609 (B.A.P. 9th Cir. 1998) ........................ 7

*In re Biring*, 2012 WL 370877 at *5-6 (B.A.P. 9th Cir. 2012) ........................ 8

*In re Chang Sup Han*, 2013 WL 3404321 at *1-2 (C.D. Cal. 2013) ........................ 8

*In re Dobrayel*, 287 B.R. 3, 7-8 (Bankr. S.D.N.Y. 2002) ........................ 6, 8

*In re Henkel*, 490 B.R. 759, 782 n.12 and 783 n.14 (Bankr. S.D. Ohio 2013) ........................ 7

*In re Kosinski*, 424 B.R. 599, 612 (B.A.P. 1st Cir. 2010) ........................ 15

*In re Reingold*, 2013 WL 1136546 at *10 (B.A.P. 9th Cir. 2013) ........................ 7, 8

*In re Sammons*, 508 B.R. 426, 430 (Bankr. D. Alaska 2014) ........................ 4

*In re Valle*, 469 B.R. 35, 43 (Bankr. D. Idaho 2012) ........................ 3

*In re Vamvakaris*, 197 B.R. 228, 230 (Bankr. E.D. Va. 1996) ........................ 7

*In re Vanwinkle*, 562 B.R. 671 (Bankr. E.D. Ky. 2016) ........................ 4

*In re Wettstein*, 2015 WL 1246052 at *11 (Bankr. C.D. Cal. 2015) ........................ 7

*Markey v. Club*, 2008 WL 315698, at *8 (Cal. Ct. App. 2008) ........................ 14

*Southern Union Co. v. Southwest Gas Corp.*, 180 F.Supp.2d 1021, 1038-39 (D. Ariz. 2002) ..... 5, 6

*Ward v. Nat'l Entm't Collectibles Ass'n, Inc.*, 2012 WL 12885073, at *5 (C.D. Cal. 2012) ............ 9

*Winegar v. Gray*, 204 Cal. App. 2d 303, 314 (1962) ........................ 5

1

## **STATUTES**

2  11 U.S.C. § 523 ................................................................................................................. 1, 4

3  11 U.S.C. § 523(a) .................................................................................................................. 4

4  11 U.S.C. § 523(a)(2) ............................................................................................................. 7

5  11 U.S.C. § 523(a)(2)(A) ........................................................... 2, 3, 4, 7, 10, 11, 13, 14, 15

6  11 U.S.C. § 523(a)(2)(B) ................................................................. 2, 3, 10, 13, 14, 15

7

8

9

10

11

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TO THE HONORABLE VINCENT P. ZURZOLO, UNITED STATES BANKRUPTCY JUDGE:**

Defendant Yueting Jia ("Mr. Jia") hereby submits this reply to the *Memorandum of Points and Authorities in Support of Opposition to Defendant's Motion to Dismiss* (the "Opposition") filed by Hong Liu (the "Plaintiff") and in support of Mr. Jia's *Motion to Dismiss Complaint Under Federal Rule of Civil Procedure 12(B) for Failure to State a Claim* (the "Motion").[1]

## I.    **INTRODUCTION**

The Complaint should be dismissed because the Plaintiff has not alleged a cause of action to establish a "debt" that may be excepted from discharge. Dischargeability is a two-step process, the first of which is the adjudication of a debt under applicable state law. The Plaintiff is required to plead a legally cognizable claim under state law. However, the Plaintiff has not asserted or alleged in the Complaint any cause of action under applicable state law to create a debt. The Complaint contains causes of action under only 11 U.S.C. § 523. Mr. Jia is entitled to know the legal basis for the disputed, unliquidated and yet-to-be determined claim the Plaintiff asserts. The Plaintiff ignores this important threshold issue and he has not indicated that he has any intention of correcting the deficiency in the Complaint. For this reason alone, the Complaint should be dismissed.

The Complaint should be dismissed because, as a matter of law, the debt that the Plaintiff seeks to except from the discharge is, at best, a mere breach of contract claim. The Plaintiff cannot dispute that, according to the Complaint and his proof of claim, the alleged "debt" is the compensation he believes he is entitled to under the Director Agreement and that he did not receive upon his termination (*i.e.*, as defined by the Plaintiff, the "1% Smart King Value"). However, this amount, the benefit-of-the-bargain, is not recoverable for fraud under California law. Thus, the Plaintiff cannot establish a debt for fraud under applicable state law as he is

---

[1]    Capitalized terms not expressly defined herein shall have the meanings ascribed to them in the Motion.

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

REPLY

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000  •  Fax 714 445-1002

1   required to do.  Moreover, the 1% Smart King Value was not proximately caused by the alleged

2   fraud, but rather, as alleged by the Plaintiff, his termination without sufficient grounds.

3        Allegations of fraud cannot be used to except the Plaintiff's asserted breach of contract

4   claim from the discharge.  The amounts allegedly due under the Director Agreement cannot be

5   damages for fraud under applicable law and were not proximately caused by the alleged

6   misrepresentations.  In his attempt to distinguish the authorities cited by Mr. Jia, the Plaintiff

7   seems to miss these points entirely.  The cases cited by the Plaintiff for the proposition that he can

8   recover the amounts arising under the Director Agreement as damages are distinguishable and

9   support Mr. Jia's position as those cases largely involve out-out-pocket damages, which are

10  generally recoverable for fraud.  While the Complaint contains two vague allegations that the

11  Plaintiff was harmed by leaving Mayer Brown, such alleged unquantified harm does not form the

12  basis of the damages the Plaintiff seeks to except from the discharge.

13       The Complaint should be dismissed because the Plaintiff failed to alleged sufficient facts

14  to support a claim under either § 523(a)(2)(A) or § 523(a)(2)(B).  The Plaintiff's claim under

15  § 523(a)(2)(A) must be dismissed.  The alleged oral misrepresentations concerning the status of

16  the Evergrande Series A investment are not actionable under § 523(a)(2)(A) because, as argued by

17  the Plaintiff, they concern the financial condition of an insider.  The Plaintiff's assertion that other

18  alleged misrepresentations support his § 523(a)(2)(A) claim are not supported by the Complaint.

19  The Complaint does not contain alleged facts to establish the elements of § 523(a)(2)(A) based on

20  any other alleged misrepresentation.  That is, the Plaintiff has not alleged a claim for fraud based

21  on any misrepresentation that he does not concurrently assert relates to the financial condition of

22  an insider to support his claim under § 523(a)(2)(B).

23       The Plaintiff's claim under § 523(a)(2)(B) must be dismissed.  The Plaintiff's

24  § 523(a)(2)(B) claim hinges entirely on the statements in the Employment Agreement and the

25  Director Agreement (collectively, the "Agreements") that the Evergrande Series A investment or

26  closing was "completed."  Contrary to the Plaintiff's argument, the meaning of the word

27  "completed" does not give rise to a question of fact.  The Plaintiff's assertion that he was told that

28  Smart King had "received $2 billion" is based on *alleged oral statements that cannot support a*

1   *claim under § 523(a)(2)(B).*  Importantly, neither the Employment Agreement nor the Director

2   Agreement state that Smart King received $2 billion or any portion thereof.  What the Plaintiff

3   attempts to characterize as Mr. Jia's interpretation is actually the plain meaning of the words in the

4   agreements upon which the Plaintiff relies.  Moreover, it is undisputed that, prior to the Plaintiff's

5   employment, Evergrande had entered into the Merger Agreement obligating it to invest $2 billion

6   in the increments set forth therein.  The Complaint does not alleged facts demonstrating that

7   statements in the Agreements were untrue.

8          The Complaint should be dismissed with prejudice.  The deficiencies in the Complaint are

9   not matters that can be cured by "additional investigation."  There are fundamental problems with

10  Complaint that cannot be cured.  The damages the Plaintiff seeks to recover and except from the

11  discharge are not recoverable on a fraud claim.  The Plaintiff has not alleged any

12  misrepresentations that can support a claim under § 523(a)(2)(A).  Moreover, the allegations in the

13  Complaint demonstrate that the alleged misrepresentations underpinning his claims under §§

14  523(a)(2)(A) and 523(a)(2)(B) are, in fact, based on statements that were true.  Accordingly, Mr.

15  Jia requests that the Complaint be dismissed without leave to amend.

16

17  **II.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE PLAINTIFF HAS**

18      **NOT ESTABLISHED A DEBT UNDER STATE LAW**

19          The Plaintiff has failed to establish a debt under applicable state law.  "Making a

20  determination regarding the dischargeability of a debt involves a two-step process: first, the

21  establishment of the debt itself; and second, a determination as to the nature—dischargeable or

22  nondischargeable—of that debt."  *In re Valle*, 469 B.R. 35, 43 (Bankr. D. Idaho 2012).  The Ninth

23  Circuit agrees that the issue of dischargeability is a two-step process:

24          [T]here are two distinct issues to consider in the dischargeability
           analysis:  first, the establishment of the debt itself, which is subject to
25         the applicable state statute of limitations, and, second a determination
           as to the nature of that debt, an issue within the exclusive jurisdiction
26         of the bankruptcy court and thus governed by Bankruptcy Rule 4007.

27  *Banks v. Gill Distribution Centers, Inc.*, 263 F.3d 862, 868 (9th Cir. 2001).  The establishment of

28  the underlying debt is governed by state law.  *See Grogan v. Garner*, 498 U.S. 279, 283 (1991)

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000  •  Fax 714 445-1002

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1    ("The validity of a creditor's claim is determined by rules of state law."); *see also In re Sammons*,

2    508 B.R. 426, 430 (Bankr. D. Alaska 2014).  Unless the creditor is able to establish a debt under

3    applicable state law, there is no need to analyze the dischargeability of the alleged debt.  *See In re*

4    *Sammons*, 508 B.R. at 430–31 (Bankr. D. Alaska 2014) ("Because [the plaintiff's] liability was not

5    liquidated prepetition, the dischargeability analysis requires two steps: first, whether a debt exists

6    as to [the plaintiff] under applicable state law, and second, whether the debt is excepted from

7    discharge under § 523(a).  **If there is no debt, the second step in the analysis is unnecessary**."

8    (emphasis added)).

9         The court's decision in *In re Vanwinkle*, 562 B.R. 671 (Bankr. E.D. Ky. 2016), which is

10   discussed in the Motion, adopted the two-step process.  *See Vanwinkle*, 562 B.R. at 677 ("The §

11   523(a)(2)(A) analysis is a two-step process . . . .").  The Plaintiff's attempt to distinguish the

12   *Vanwinkle* decision based on the timing of the alleged fraud misses the mark.  The *Vanwinkle*

13   decision is instructive for two reasons (neither of which depends on the timing of the alleged

14   fraud).  First, consistent with the authorities above, the court stated that § 523 does not "create[] a

15   debt[,]" but excepts an existing debt from discharge.  *See id.* at 678.  Second, allegations of fraud

16   cannot be used to except a contract debt from discharge.  Rather, the plaintiff must alleged causes

17   of action for losses caused by the asserted fraud.  *See id.* at 677-78.

18        Here, there is no dispute that the Plaintiff failed to plead a cause of action to create a debt.

19   The Plaintiff omitted the first step in the two-step process.  The Plaintiff must allege facts to

20   establish a debt based on a specific cognizable legal theory under applicable state law.  Mr. Jia has

21   a right to notice of the legal theory upon which the Plaintiff relies—a matter that is all the more

22   important as the Plaintiff seems to be attempting to mix and match legal theories.  The Plaintiff

23   has not addressed this deficiency and has not argued that he will cure it with an amendment to the

24   Complaint.  Because the Plaintiff cannot establish a debt, there is nothing to except from the

25   discharge.  Accordingly, the Complaint should be dismissed.

26

27

28

III.    **THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE PLAINTIFF'S ALLEGED DEBT IS NOT RECOVERABLE FOR FRAUD**

The Complaint should be dismissed because the Plaintiff's alleged debt is not recoverable for fraud and cannot be excepted from the discharge.  Benefit-of-the-bargain damages award "the difference in value between what the plaintiff actually received and what he was fraudulently led to believe he would receive."  *See Alliance Mortgage Co. v. Rothwell*, 10 Cal.4th 1226, 1240 (1995); *see also Winegar v. Gray*, 204 Cal. App. 2d 303, 314 (1962) ("'Damages are awarded in an action for breach of contract to give the injured party the benefit of his bargain and insofar as possible to place him in the same position he would have been in had the promisor performed the contract.'").

Benefit-of-the-bargain damages are not recoverable for fraud under California law.  *See Southern Union Co. v. Southwest Gas Corp.*, 180 F.Supp.2d 1021, 1038-39 (D. Ariz. 2002); *see also EduMoz, LLC v. Republic of Mozambique*, 2105 WL 13697385 at *15 (C.D. Cal. 2015) (holding that the plaintiff was not entitled to the retainers and success fees provided for in the subject contract on its fraud claim because they were the "benefit of the bargain" set forth in such contract).  "'In California, a defrauded party is ordinarily limited to recovery his 'out-of-pocket' loss. . . .'"  *Alliance Mortgage Co.*, 10 Cal.4th at 1240; *see also Christiansen v. Roddy*, 186 Cal. App. 3d 780, 790 (1986) ("The proper measure of tort damages is the 'out-of-pocket' measure; successful tort plaintiffs are not entitled to have damages computed on a contract, or 'benefit-of-the-bargain,' theory.").

The Plaintiff's attempt to distinguish the *Southern Union Co.* decision on the basis that it does not involve the "dischargeability of a debt" or arise under "the federal bankruptcy laws" misses the point entirely.  As discussed above, the Plaintiff must first establish a debt under *state law*.  The Plaintiff asserts that his alleged debt (the 1% Smart King Value) was incurred as a result of fraud.  (*See, e.g.*, Opp'n. at 3, lines 3-4.)  The District Court's decision in *Southern Union Co.* dictates that the Plaintiff cannot recover the amounts allegedly due under the Director Agreement based on a cause of action for fraud.  *See Southern Union Co.*, 180 F.Supp.2d at 1038-39.  Thus, the Plaintiff's purported damages are barred by California law.

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1    The Plaintiff's assertion that *Southern Union Co.* is distinguishable because the plaintiff in

2    that case sought benefit-of-the-bargain damages "even though it never entered into an agreement

3    with the defendant" is erroneous. The plaintiff in *Southern Union Co.* entered into an agreement,

4    the "Standstill Agreement," and sought damages measured by the benefits the plaintiff would have

5    received had the defendant had acted as promised. *See Southern Union Co.*, 180 F.Supp.2d at

6    1027, 1030, & 1038. In addition, the Plaintiff's assertion that the *Southern Union Co.* decision

7    supports his position because, like the plaintiff in that case, but for the alleged fraud, he would not

8    have entered into the Director Agreement reflects a misunderstanding of the decision. (*See* Opp'n.

9    at 16, n. 6.) This is the exact position that the District Court in *Southern Union Co.* believed was

10   inconsistent with seeking to recover benefit-of-the-bargain damages. *See id.* at 1038 (stating that

11   benefit-of-the-bargain damages seem "inconsistent with a fraudulent inducement claim.").

12   As discussed in the Motion, assuming a debt can be created pursuant to applicable state

13   law, under federal bankruptcy law, there must be a sufficient causal connection between the debt

14   and the alleged fraud. Contrary to the Plaintiff's assertion, the cases cited in the Motion do not

15   involve situations where plaintiffs did not adequately allege fraud. (*See* Opp'n. at 17, n 6.)

16   Rather, the cases cited in the Motion illustrate analogous examples where courts have held that

17   benefit-of-the-bargain damages cannot be excepted from the discharge based on fraud because

18   they were not caused by the fraud.

19   For example, in *Dobrayel*, the debtor and the plaintiff entered into a contract by which the

20   debtor agreed to renovate the dental office leased by the plaintiff. *See In re Dobrayel*, 287 B.R. 3,

21   7-8 (Bankr. S.D.N.Y. 2002). The court determined that the debtor abandoned the contract and had

22   no intention to perform shortly after he received the last contract payment from the plaintiff in

23   August 14, 1998. *See id.* at 11. The plaintiff's alleged damages consisted of a number of

24   components, including the plaintiff's breach of contract damages for the amount he paid to a third

25   party to complete the renovation (in addition to and above the contract price paid to the debtor).

26   *See id.* at 24. The court held that there was no "causal connection" between the debtor's fraud and

27   the amount the plaintiff paid to the third party after the debtor abandoned the contract. According

28   to the *Dobrayel* court, the lack of a causal connection was evident by the fact that had the debtor

merely breached the contract without committing fraud, the plaintiff's breach of contract damages for the amount "to complete the project would have been precisely the same."  *See id.*; *see also In re Henkel*, 490 B.R. 759, 782 n.12 and 783 n.14 (Bankr. S.D. Ohio 2013) (holding that "out of pocket expenditures . . . may be non-dischargeable as monies obtained by fraud[,] but that lost profits had the construction project been completed as agreed do not seem to be debts obtained by fraud); *In re Vamvakaris*, 197 B.R. 228, 230 (Bankr. E.D. Va. 1996) (holding that alleged misrepresentations concerning the existence of theft insurance coverage were not the proximate cause of damages arising from the subsequent theft of the plaintiff's property).

The cases cited by the Plaintiff are largely unreported, are distinguishable, and do not analyze the type of damages that can be recovered or excepted from the discharge based on fraud. In fact, Plaintiff's cited cases actually support Mr. Jia's position as follows:

- In *Wettstein*, the agreement at issue was a promissory note and the amounts excepted from discharge were the plaintiff's *out-of-pocket damages, e.g.*, the money the plaintiff invested with the debtor and charges the plaintiff incurred in withdrawing the money invested from his pension plan.  *See In re Wettstein*, 2015 WL 1246052 at *11 (Bankr. C.D. Cal. 2015).

- Contrary to the Plaintiff's parenthetical, in *Barrack*, a contract debt was not excepted from discharge.  In *Barrack*, the Bankruptcy Appellate Panel for the Ninth Circuit reversed, in part, the bankruptcy court's dismissal of the plaintiff's nondischargeability complaint on the basis that the plaintiff alleged oral representations actionable under § 523(a)(2)(A) and *remanded for further proceedings.  See In re Barrack*, 217 B.R. 598, 606 & 609 (B.A.P. 9th Cir. 1998).  The BAP expressly did not analyze the damages alleged by the plaintiff.  *See id.* at 605 n.5 (declining to consider "the type of damages or loss which can be sustainable under § 523(a)(2) as opposed to 523(a)(6). . . .").  Moreover, the damages primarily sought by the plaintiff were out-of-pocket damages (such as, amounts paid by the plaintiff due to the alleged fraud).  *See id.* at 602.

- In *Reingold*, the debt excepted from the discharge were the plaintiff's out-of-pocket damages, *i.e.* loan proceeds totaling $76,000, which the court determined were

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

obtained by false pretenses.  *See In re Reingold*, 2013 WL 1136546 at *10 (B.A.P. 9th Cir. 2013).

- The *Biring* decision involved issue preclusion arising from default judgments on fraud and non-fraud causes of action.  The debtor did not argue that, and the BAP did not analyze whether, certain of the damages included in the default judgment were not recoverable on the plaintiff's fraud causes of action under applicable state law.  *See In re Biring*, 2012 WL 370877 at *5-6 (B.A.P. 9th Cir. 2012).  Rather, the BAP held that the issue of fraud was actually litigated and necessarily decided for purposes of issue preclusion.  *See id.*

- In *Chang Sup Han*, the plaintiffs' claims were determined pre-bankruptcy by the California Labor Commissioner.  *See In re Chang Sup Han*, 2013 WL 3404321 at *1-2 (C.D. Cal. 2013).  The District Court was not confronted with the damages recoverable for fraud.  Moreover, the debt excepted from discharge were the plaintiffs' unpaid wages for services performed.  *See id.* at *1 & 5.  Here, the Plaintiff has not alleged he was undercompensated for this services, but seeks the amounts he believes he is due under the Director Agreement (whether he was adequately compensated for the "work" he allegedly performed or not).

The debt alleged in the Complaint cannot be excepted from the discharge.  The validity of the Plaintiff's alleged debt is first determined under state law.  The Plaintiff is seeking to recover breach of contract damages on account of a fraud claim.  The debt the Plaintiff seeks to except from the discharge is the amount that he believes he is owed under the Director Agreement (the 1% Smart King Value).  (*See, e.g.*, Opp'n. at 3, lines 3-4.)  However, under California law, the alleged 1% Smart King Value is not recoverable on a cause of action for fraud.  Moreover, the amount allegedly due under the Director Agreement was not caused by the alleged fraud.  Like the plaintiff in *Dobrayel*, there is no causal connection between the breach of contract damage alleged by the Plaintiff and the alleged fraud.  The reasoning by the court in *Dobrayel* is instructive – with or without the alleged fraud, the Plaintiff's claim for the amounts he believes is due under the Director Agreement is precisely the same.  According to the Plaintiff, he is entitled to the 1%

1   Smart King Value because the he was terminated "without any legitimate basis. . . ."  (*See* Compl.

2   at ¶¶ 3, 55 and 56.)  As such, the Plaintiff's damages are, at best, dischargeable breach of contract

3   damages – the amount he believes that he was contractually entitled to be paid, but didn't receive.

4          The Plaintiff's assertion that, in joining Faraday, he forwent "his substantial salary and

5   equity partnership" is a case of misdirection.  (*See* Opp'n. at 17, lines 6-9.)  While the Complaint

6   contains two vague allegations referencing that the Plaintiff suffered certain losses by leaving

7   Mayer Brown, these alleged losses do not comprise the "debt" at issue in the Complaint and that

8   the Plaintiff seeks to except from discharge.  (*See* Compl. at ¶¶ 59-60.)  Rather, the Complaint

9   makes clear that the debt sought to be excepted from the discharge is the amount that the Plaintiff

10  believes he is entitled to be paid under the Director Agreement.   (*See id.* at ¶¶ 1, 3, 4, 54, 55, &

11  58.)  Similarly, the Plaintiff's proof of claim is for the amounts set forth in the Director

12  Agreement, and not alleged losses for leaving Mayer Brown and joining Faraday.  (*See id.* at ¶ 1;

13  *see also* Mot., Ex. 1 at 26 of 40.)  Any assertion by the Plaintiff that the debt to be proven in the

14  adversary proceeding and excepted from the discharge are the alleged losses from leaving Mayer

15  Brown is an admission that the Plaintiff's alleged claims were not adequately pled in the

16  Complaint.

17         Moreover, as argued in the Motion, the Plaintiff fails to quantify the alleged losses he

18  suffered from Mayer Brown, which are entirely within his personal knowledge.  The Plaintiff's

19  response that he does not need to allege damages with particularity is incorrect.  As stated by one

20  court:

21              Under the heightened pleading standard set forth in Rule 9(b) of the
                Federal Rules of Civil Procedure, "damages elements of [fraud]
22              claims must be pled with particularity." *Wayne Merritt Motor Co. v.
                N.H. Ins. Co.*, No. 11-CV-01762-LHK, 2011 U.S. Dist. LEXIS
23              122320, *36 (N.D. Cal. Oct. 21, 2011); *see also Kearns v. Ford Motor
                Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009) (where a plaintiff claims
24              fraud, the "entire complaint must . . . be pleaded
                with particularity"); *Brewer v. Indymac Bank*, 609 F. Supp. 2d 1104,
25              1121 (E.D. Cal. 2009) ("[I]n an action for fraud and deceit a cause of
                action is stated when the facts constituting the fraud are alleged and *a
26              resulting injury is pleaded*" (emphasis added)).

27  *Ward v. Nat'l Entm't Collectibles Ass'n, Inc.*, 2012 WL 12885073, at *5 (C.D. Cal. 2012).

28

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1   Accordingly, the Complaint should be dismissed because the damages alleged by the

2   Plaintiff are not recoverable for fraud under applicable law and cannot be excepted from the

3   discharge based on fraud.

4

5   **IV.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE PLAINTIFF HAS**

6   **FAILED TO STATE A CLAIM UNDER EITHER SECTION 523(a)(2)(A) OR**

7   **SECTION 523(a)(2)(B)**

8       **A.    The Plaintiff Failed to State a Claim under Section 523(a)(2)(A)**

9       The Plaintiff's claim under § 523(a)(2)(A) must be dismissed.  There is no dispute that a

10  debt based on an oral statement concerning the financial condition of the debtor or an insider is

11  dischargeable.  *See* 11 U.S.C. § 523(a)(2)(A).  As pleaded in the Complaint, the Plaintiff's claims

12  under § 523(a)(2)(A) and § 523(a)(2)(B) are based on the same misrepresentations and involve the

13  same content (the Evergrande investment).  For purposes of his § 523(a)(2)(B) claim, the Plaintiff

14  asserts that the alleged misrepresentations concern the financial condition of an insider.  (*See*

15  Compl. at ¶¶ 67-68.)  Likewise, in his Opposition, the Plaintiff argues that the alleged

16  representations regarding the "completion" of the $2 billion Evergrande Series A investment relate

17  to the financial condition of an insider.  (*See* Opp'n. at 11-12.)  The Plaintiff cannot have it both

18  ways.  The same allegations and arguments that support his § 523(a)(2)(B) claim require the

19  dismissal of his claim pursuant to § 523(a)(2)(A).  Based on the allegations in the Complaint, the

20  alleged misrepresentations related to the Evergrande Series A investment are not actionable under

21  § 523(a)(2)(A), and the § 523(a)(2)(A) claim should be dismissed.

22      In an effort to preserve his § 523(a)(2)(A) claim, the Plaintiff now asserts that this claim is

23  based on two other alleged misrepresentations:  (1) that the Plaintiff would be entitled to the 1%

24  Smart King Value as set forth in the Director Agreement; and (2) that the Plaintiff would be

25  covered by Smart King's D&O insurance.  For this position, the Plaintiff cites the Court to the

26  allegations in the Complaint found at paragraphs 35 to 37.  (*See* Opp'n. at 10, line 13 to 11, line 3.)

27      First, the assertion that Mr. Jia never intended to pay the Plaintiff the amount set forth in

28  the Director Agreement is new.  The Plaintiff has not made that allegation in the Complaint and it

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1    certainly is not found in paragraphs 35-37.  While in the *Opposition*, the Plaintiff argues that Mr.

2    Jia never intended to pay him the 1% Smart King Value, that argument is not supported by a cite

3    to a corresponding allegation in the Complaint.  (*See* Opp'n. at 10, line 18.)  Rather, paragraph 36,

4    in relevant part, alleges only that, in the Director Agreement, Mr. Jia agreed to pay the Plaintiff "a

5    cash amount equal to 1% of the value of Smart King shares. . . ."

6           The assertion that Mr. Jia never intended to pay the Plaintiff was not alleged in the

7    Complaint and is inconsistent with the Complaint.  According to the Complaint, the Plaintiff

8    worked for FF for one year.  While not alleged in the Complaint, the Plaintiff cannot deny that he

9    was paid over $1.7 million for that one year's worth of "work."  The argument that Mr. Jia never

10   intended to pay the Plaintiff is simply incredible, not alleged, and contradicted by that fact that

11   Plaintiff was actually paid substantial sums.  That the Plaintiff was not paid the amount set forth in

12   the Director Agreement for a number of reasons, including, without limitation, because the

13   conditions precedent to any compensation have not occurred, certainly does not prove that Mr. Jia

14   never intended to pay the amount set forth in the Director Agreement on the terms and conditions

15   of the agreement.  Moreover, in an unnecessary and baseless effort to besmirch Mr. Jia and FF, the

16   Plaintiff alleged in the Complaint that his termination was retaliation for acts taken after he was

17   employed, which is directly contrary to the argument that Mr. Jia never intended to honor the

18   Director Agreement from the beginning.

19          Second, the Plaintiff cannot rest his § 523(a)(2)(A) claim on the alleged assertion that he

20   would be "fully covered by [Smart King] with executive indemnifications to the extent set forth in

21   [Smart King's] standard form of director indemnification agreement[.]"  (*See* Compl. at ¶ 35.)  The

22   Plaintiff has not pleaded sufficient facts to state a claim for fraud based on this particular

23   statement.   The Plaintiff has not alleged that this statement in the Director Agreement was

24   material or that he justifiably relied on this statement.  The Complaint does not contain any facts

25   detailing how any reliance on this statement caused the Plaintiff to suffer any damages.  The

26   Complaint does not contain sufficient factual allegations demonstrating that the passages in the

27   Director Agreement referencing D&O insurance or indemnification agreements were actually false

28   when made and with the intent to deceive.  While the Complaint makes the conclusory allegation

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1  that Smart King did not maintain a D&O insurance policy (*see* Compl. at ¶ 36), even if that

2  allegation is true, the Directors Agreement does not represent otherwise.

3      For purposes of the fraud alleged in the Complaint, the Complaint is focused on the status

4  of the Evergrande transaction, and the allegation regarding the lack of D&O insurance appears to

5  be nothing more than an afterthought and a feeble attempt to oppose Mr. Jia's request for a

6  dismissal.  Other than the alleged misrepresentations regarding the completion of the $2 billion

7  Evergrande Series A investment, the Complaint does not contain allegations that any other alleged

8  representations were material or relied upon by the Plaintiff.  Rather, the only alleged

9  representation that is emphasized to be "highly material" and critical by the Plaintiff in deciding

10  whether to join FF is the alleged representation concerning the completion of Evergrande

11  transaction.  (*See id.* at ¶ 29.)

12      The Plaintiff does not refute that allegations in the Complaint suffer from a lack of

13  particularity.  The Plaintiff's sole response is that the alleged representations *contained in the*

14  *Agreements* are particular.  However, the Complaint contains a series of purported *oral*

15  representations.  As detailed in the Motion, the alleged oral misrepresentations lack the specificity

16  and detail required by the Federal Civil Rules, *i.e.*, what was said, who said it, and where and

17  when it was said.  (*See* Mot. at 13, lines 8-25.)  The Plaintiff does not deny this.

18      The Plaintiff has taken inconsistent positions as to the *individual* that made the alleged oral

19  misrepresentations.  The same alleged misrepresentations that the Plaintiff ascribes to only Mr. Jia

20  in the Complaint is ascribed to two or three persons in the complaint he filed against Faraday and

21  others in New York (the "New York Complaint").[2]  (*Compare* Compl. at ¶¶ 24-27; *with* Ex. 1 at

22  ¶¶ 35-37.)  For example:

| Complaint | New York Complaint |
|---|---|
| "In January 2018, during meetings and teleconferences, **the Debtor represented** to Mr. Liu. . . ." (*See* Compl. at ¶ 24 (emphasis added).) | "In January 2018, during meetings and teleconferences, **Mr. Jia, Mr. Wang, and Ms. Deng represented** to Mr. Liu . . . ." (*See* Ex 1 at ¶ 36 (emphasis added).) |

[2]    A true and correct copy of the New York Complaint is attached hereto as Exhibit "1."

| "During multiple meetings on these dates, **the Debtor touted** the successful completion. . . ." (*See* Compl. at ¶ 26 (emphasis added).) | "During multiple meetings on these dates, **Mr. Jia, Mr. Wang, and Ms. Dent touted** the successful completion. . . ."  (*See* Ex 1 at ¶ 37 (emphasis added).) |
|---|---|

Thus, the Plaintiff's claim under § 523(a)(2)(A) should be dismissed.  Based on the Plaintiff's position, the alleged oral misrepresentations concerning the status of the Evergrande Series A investment cannot support a claim based on § 523(a)(2)(A).  The Plaintiff has not stated a claim for fraud based on any other alleged misrepresentation (*i.e.*, a misrepresentation that is not based on the status of the Evergrande investment).  Moreover, other than statements contained in the Agreements, it is undisputed that the fraud alleged in the Complaint fails for a lack of particularity.

### B.   The Plaintiff Failed to State a Claim under Section 523(a)(2)(B)

The Plaintiff has not pleaded sufficient facts to state a claim pursuant to § 523(a)(2)(B). The Plaintiff's claim under § 523(a)(2)(B) rests entirely on the statement in the Agreements that the Evergrande Series A financing was "completed."[3]  There is no dispute that Season Smart, Evergrande's affiliate, executed the Merger Agreement committing it to invest $2 billion in Smart King prior to the Plaintiff's employment.  There is no dispute that Evergrande started funding by investing $300 million in Smart King prior to the Plaintiff's employment.  There is no dispute that Evergrande ceased its investments as required by the Merger Agreement due to dispute that arose between it and Smart King after Plaintiff jointed FF.

The Plaintiff's assertion that there is a dispute of fact as to the meaning of the word "completed" is wrong.  The Plaintiff argues that Mr. Jia interprets "completed" as "when the deal for funding closed" and he interprets "completed" as "when the funds were invested."  (*See* Opp'n. at 11, lines 10-12.)  However, the Plaintiff's position that Smart King received a $2 billion investment is based on alleged *oral* representations that are not actionable under § 523(a)(2)(B). (*See, e.g.*, Compl. at ¶¶ 24-26.)  Any alleged misrepresentations that Smart King actually received

---

[3]    The new alleged misrepresentations relied upon to support the Plaintiff's § 523(a)(2)(A) claim, *i.e.*, that Mr. Jia never intended to perform the Director Agreement and that Smart King did not have D&O insurance, could not support a § 523(a)(2)(B) because they do not concern the financial condition of Mr. Jia or an insider.

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

2822183.2

REPLY

1    $2 billion are irrelevant to the Plaintiff's claims.  They are not actionable under § 523(a)(2)(A)

2    because, as discussed above, the Plaintiff alleges they concern the financial condition of an

3    insider, and they are not actionable under § 523(a)(2)(B) because they are not in writing.

4          For purposes of § 523(a)(2)(B), the alleged false statement must be in writing, and ***neither***

5    ***the Employment Agreement nor the Director Agreement state that Smart King received $2***

6    ***billion***.  Rather, the Director Agreement states that Smart King "successfully completed its Series

7    A financing in December 2017" and the Employment Agreement states that Smart King

8    "successfully **completed first closing** of Series A financing in December 2017[.]  (*See* Compl.,

9    Ex. B at 1, ¶ 2 and Ex. A at 2 (emphasis added).)  The Employment Agreement further states that

10   the completion of the Series A financing remained subject to regulatory (CFIUS) approval.  What

11   the Plaintiff attempts to couch as Mr. Jia's interpretation of the word "completed" is actually

12   consistent with the words used in the Agreements upon which the Plaintiff relies.  Thus, the non-

13   conclusory factual allegations in the Complaint do not establish a claim that is plausible on its face

14   because the statements concerning the Evergrande investment were true.

15         Moreover, California courts have held that assertions that are "too vague or indefinite . . .

16   "cannot constitute an actionable false representation."  *See Markey v. Club*, 2008 WL 315698, at

17   *8 (Cal. Ct. App. 2008); *Higgins v. Disney/ABC Int'l Television, Inc.*, 2009 WL 692701, at *8

18   (Cal. Ct. App. 2009).  Assuming that, as contended by the Plaintiff, the word "completed" is

19   subject to multiple reasonable interpretations, it is ambiguous, vague and indefinite, and, thus,

20   cannot constitute an action for fraud.  Either way, the Plaintiff's § 523(a)(2)(A) claim should be

21   dismissed.

22         Similarly, the Complaint fails to alleged sufficient facts to establish remaining elements of

23   his claim under § 523(a)(2)(B).  The Plaintiff has not adequately alleged that Mr. Jia intended to

24   deceive the Plaintiff or knew that the statements in the Agreements concerning the completion of

25   the Evergrande transaction were false.  As discussed above, the Merger Agreement was fully

26   document and executed, Evergrande was obligated to fund $2 billion as set forth in the Merger

27   Agreement, and Evergrande commenced funding prior to the Plaintiff's employment.  The

28   Complaint recognizes that prior to his employment Evergrande began funding.  (*See* Compl. at ¶

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1  28.)  All of the Plaintiff's elements are undercut by the truth of the statements in the Agreements.

2  The Plaintiff's allegation that Mr. Jia knew that hiring the Plaintiff, an attorney, would bolster

3  Faraday's credibility with stakeholders and make it more likely that Faraday could bring a vehicle

4  to market is pure speculation by someone who lacks personal knowledge.  The Plaintiff fails to

5  provide any factual support for this assertion.

6          The Plaintiff's argument that the standard for reliance under § 523(a)(2)(B) is different than

7  the standard under § 523(a)(2)(A) is correct, but it does not serve to advance Plaintiff's position.

8  The standard under § 523(a)(2)(B) has been described as *more demanding*.  *See In re Kosinski*,

9  424 B.R. 599, 612 (B.A.P. 1st Cir. 2010)  ("The reasonable reliance assessment required by

10  § 523(a)(2)(B) imposes a more demanding standard than that applicable to the issue of justifiable

11  reliance. We conclude that Douglas failed to meet this standard.").  The Plaintiff cannot meet the

12  reasonable reliance standard as judged by an objective prudent person.  The Plaintiff's

13  interpretation of statements in the Agreement that the Series A financing or "closing" was

14  completed meant that Smart King received $2 billion is unreasonable by an objective prudent

15  person standard.  (*See* Compl., Ex. B at 1, ¶ 2 and Ex. A at 2.)  Additionally, the Employment

16  Agreement stated that the financing remained subject to regulatory approval in China.  Thus,

17  Plaintiff's interpretation is not objectively reasonable because it is inconsistent with the plain

18  meaning of the words used in the Agreements.

19

20  **V.      THE COMPLAINT SHOULD BE DISMISSED WITHOUT LEAVE TO AMEND**

21          The Complaint should be dismissed with prejudice because leave to amend would be

22  futile.  Contrary to the Plaintiff's argument, no amount of "additional investigation" will cure the

23  deficiencies in the Complaint.  (*See* Opp'n. at 18, n. 8.)  The Complaint suffers from fundamental

24  problems that cannot be corrected.  The damages alleged in the Complaint cannot be recovered for

25  fraud and cannot be excepted from the discharge.  The Plaintiff has not alleged an actionable

26  misrepresentation for purposes of § 523(a)(2)(A) because none exits.  Moreover, with respect to

27  both §§ 523(a)(2)(A) and (B), the Plaintiff cannot change the fact that the statements in the

28  Agreement were true.

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

**VI.**    **CONCLUSION**

Based on the foregoing, Mr. Jia respectfully requests that the Complaint be dismissed without leave to amend.

Respectfully Submitted,

DATED:  April 30, 2020                    SMILEY WANG-EKVALL, LLP


By:    _/s/ Robert S. Marticello_
        ROBERT S. MARTICELLO
        Attorneys for Defendant Yueting Jia

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1

## <u>DECLARATION OF ROBERT S. MARTICELLO</u>

2

3          I, Robert S. Marticello, declare as follows:

4          1.          I am a partner with Smiley Wang-Ekvall, LLP, attorneys for Defendant Yueting Jia

5    ("Mr. Jia"), in the case filed by Hong Liu.  I am licensed to practice before this Court and the

6    courts of the State of California.  I know each of the following facts to be true of my own personal

7    knowledge, except as otherwise stated and, if called as a witness, I could and would competently

8    testify with respect thereto.  I make this declaration in support of Mr. Jia's reply in support of his

9    *Motion to Dismiss Complaint Under Federal Rule of Civil Procedure 12(B) for Failure to State a*

10   *Claim.*  Defined terms shall have the meanings ascribed to them in the reply.

11         2.          Attached hereto as Exhibit "1" is a true and correct copy of the New York

12   Complaint without exhibits.

13         I declare under penalty of perjury under the laws of the United States of America that the

14   foregoing is true and correct.

15         Executed on this 30th day of April, 2020, at Costa Mesa, California.

16

17                                        */s/ Robert S. Marticello*
                                          ROBERT S. MARTICELLO
18

19

20

21

22

23

24

25

26

27

28

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

2822183.2

17

DECLARATION

# EXHIBIT "1"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                                   :

HONG LIU,                             :

              Plaintiff,            :

                            :     Case No.:

          -v.-                :

                            :     **COMPLAINT**

FARADAY&FUTURE INC., SMART KING  :
LTD., JIAWEI WANG, and CHAOYING  :
DENG,                            :

                            :

              Defendants.         :
---------------------------------------------------------x

Plaintiff Hong ("Henry") Liu ("Mr. Liu" or "Plaintiff"), by and through his undersigned counsel, as and for his Complaint against Faraday&Future Inc. ("Faraday"), Smart King Ltd. ("Smart King"), Jiawei Wang ("Jerry Wang" or "Mr. Wang"), and Chaoying Deng (aka Chaoying Bossert, "Ms. Deng") (all defendants collectively, "Defendants"), respectfully alleges as follows.

## **PRELIMINARY STATEMENT**

1.      This action arises from fraudulent statements that lured Mr. Liu, a New York resident and senior equity partner in the New York office of Mayer Brown LLP, to resign his law partnership, abandon his New York law practice and client base, and leave New York with his family, in order to serve as the General Counsel for Faraday, a startup electric car company in California. After fraudulently inducing Mr. Liu to leave New York, Defendants wrongfully terminated his employment after less than one year without any legitimate basis, and brazenly refused to pay the compensation owed to Mr. Liu under the plain terms of his employment agreement, including over $6 million in cash as well as equity that Defendants represented to be worth over $100 million.

2.      As a New York-based partner at Mayer Brown and other global law firms, Mr. Liu developed one of the most active and successful China and Asia-related practices in the United

States, representing numerous prominent clients in significant transactions.

3.      Defendants knew that Mr. Liu would not leave his extraordinarily successful practice in New York unless they could induce him to believe that Faraday would offer a superior package of cash and equity compensation.   In January 2018, Mr. Yueting Jia ("YT Jia" or "Mr. Jia"), the founder, principal shareholder, and chief executive of Faraday and its parent company Smart King, whose net worth was estimated at $3.8 billion by *Forbes* in 2017, represented to Mr. Liu that Smart King had received $2 billion in a private securities placement that valued Smart King at $4.5 billion.  These representations, which were repeated by Jia's associates including defendants Mr. Wang and Ms. Deng, were false.  The $2 billion investment was not completed. Smart King never received $2 billion.

4.      Mr. Liu did not know that Mr. Jia, Mr. Wang and Ms. Deng were engaged in fraud. Nor did he know that Mr. Jia, Mr. Wang and Ms. Deng had no intention of permitting Mr. Liu to act as a bona fide general counsel, *i.e.*, as a general counsel that ensured compliance with applicable law.  Indeed, as Mr. Liu learned first hand, Faraday is tightly and secretively controlled by Mr. Jia and his clique including Mr. Wang (who is Mr. Jia's nephew) and Ms. Deng.  No outsiders are permitted to have any real decision making authority, regardless of their expertise.

5.      When Mr. Liu proactively took steps to ensure Faraday's compliance with applicable law, including by seeking investigations of workplace harassment complaints and immigration violations, and urging Mr. Jia and his family and inner circle not to engage in any irregular financial dealings, Mr. Jia stripped Mr. Liu of his authority and then terminated him without any legitimate basis.

6.      By this action, Mr. Liu seeks redress for the egregious misconduct of Defendants, including cash and equity compensation owed to him under his employment agreement as well as

other compensatory and punitive damages.

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction under Section 10(b) of the Securities

Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.  This Court

has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. §1367 because

those claims are substantially related to Plaintiff's claims under federal law.  This Court also has

subject-matter jurisdiction under 28 U.S.C. §1332(a) because the parties are citizens of different

states and the amount in controversy exceeds $75,000.

8.      This Court has personal jurisdiction over Defendants because Plaintiff's claims

relate directly to Defendants' conduct in or directed to New York, including Defendants'

negotiation of the terms of Mr. Liu's employment while he was a New York resident, making  numerous

telephone calls and emails to Mr. Liu in New York, and making payments to Mr. Liu's New York bank

account during the term of his employment.  Further, Defendants committed torts outside the State

of New York that caused injury to Mr. Liu in New York.  Additionally, certain sales of securities and

acts, practices, transactions, and courses of business constituting the securities violations alleged

in this Complaint occurred in New York.

9.      Venue is proper in this Court under 28 U.S.C. §1391(b)(2) because the Defendants

are subject to personal jurisdiction in this district and because Plaintiff's claims relate directly to

Defendants' conduct in or directed to this district.  Further, certain sales of securities and acts,

practices, transactions, and courses of business constituting the securities violations alleged in this

Complaint occurred within the Southern District of New York.

## PARTIES

10.     Mr. Liu is a resident of the State of New York.

11.     Faraday is a corporation organized under the laws of the State of California with its

3

principal place of business in Gardena, California.

12.     Smart King is a corporation organized under the laws of the Cayman Islands, with its principal place of business in Gardena, California.

13.     Jiawei Wang is a resident of the State of California.

14.     Chaoying Deng is a resident of the State of California.

## FACTUAL ALLEGATIONS

### Mr. Liu Builds a Law Practice in New York

15.     Mr. Liu is a New York-based attorney with decades of experience in global legal, business and financial industries.  He is one of the most experienced lawyers in New York in handling complex cross border matters involving the People's Republic of China ("PRC").

16.     Mr. Liu holds law degrees from Peking University Law School and Harvard Law School, and an MBA from the University of Oxford.

17.     Since 1991, Mr. Liu has been admitted to practice in New York.

18.     Between 1995 and 2000, Mr. Liu served as General Counsel and Director-General of the China Securities Regulatory Commission ("CSRC"), the national securities regulator in the PRC.  At the CSRC, Mr. Liu played a prominent role in reforming the PRC securities industry, including leading a CSRC team that drafted and enacted the PRC's first securities law in 1998.

19.     Mr. Liu is recognized globally for his significant contributions to the development of securities and financial markets in the PRC.  In 1998 and 1999, *BusinessWeek* twice honored Mr. Liu with its "Stars of Asia" awards.  In 1999, the World Economic Forum in Davos honored Mr. Liu with a "Global Leader for Tomorrow" award.

20.     In the early 2000s, Mr. Liu served as a managing director of investment banking at the New York based Donaldson, Lufkin & Jenrette (DLJ) which was later merged into Credit

Suisse First Boston (CSFB), dividing his time between New York and Hong Kong.

21.     Between 2005 and April 2014, Mr. Liu served in senior positions in the New York offices of global law firms, including as a partner with Nixon Peabody LLP, DLA Piper LLP, and Pillsbury Winthrop Shaw Pittman LLP.

**Mr. Liu Develops a Leading China Practice in New York at Mayer Brown**

22.     Between April 2014 and February 2018, Mr. Liu was an equity partner at Mayer Brown LLP in its New York office.

23.     At Mayer Brown, Mr. Liu developed one of the most active and successful China and Asia-related practices in the United States, representing many of the most prominent PRC financial institutions in significant transactions.  Mr. Liu's client base included numerous financial giants in the PRC, as well as leading companies in a wide range of industries in the PRC including transportation, infrastructure, manufacturing, insurance, and private equity.

24.     In 2015, Mr. Liu was named to *The National Law Journal's* list of "Regulatory & Compliance Trailblazers," which recognizes individuals who have "made a difference navigating the ever-changing mandates of regulatory and compliance."

25.     Within Mayer Brown, Mr. Liu's practice was recognized for its high profile clients, large deal sizes, continuing and repeat business, and optimal realization rates.  In each year of his tenure at Mayer Brown, Mr. Liu was promoted within the firm's equity partnership, rising to senior partner.  In 2017, Mr. Liu's compensation at Mayer Brown was approximately $1.35 million.

26.     On February 12, 2018, just prior to Mr. Liu's departure from Mayer Brown, the firm issued a firm-wide announcement, stating in relevant part:

> Under Henry's leadership, the Firm had developed important new relationships with some of the largest financial institutions and private equity players in China . . . Henry's wide-ranging experience has included banking and finance, M&A, investments and

5

transactions, and regulatory and disputes. He has extensive experience representing Asia and Greater China-based companies conducting business in the United States and throughout the world, including in such industries as financial institutions and investment entities, real estate and infrastructure, aviation and transportation, energy and resources, and manufacturing and technology. Henry also has advised U.S. and non-U.S. companies doing business in Asia and Greater China, including in areas such as market access, direct investment, public and private funds, capital markets, technology transfers and regulatory matters.

**Defendants Lure Mr. Liu From New York Based Upon False Representations**

27.    Between October 2017 and mid-February 2018, at the pinnacle of his success, Mr. Liu was fraudulently induced to leave his prestigious and lucrative equity partnership at Mayer Brown in New York, and his roster of blue-chip clients, and take up a position with a start-up electric car company in California that was years away from producing any cars.

28.    Faraday had been seeking for years to develop and market a viable electric car, without success.   Smart King, Faraday's holding company, has no material operations.

29.    Defendants knew that hiring Mr. Liu, a globally respected professional with decades of experience, would bolster Faraday's credibility with stakeholders.

30.    At all relevant times, Faraday and Smart King were controlled by Mr. Jia, the founder, principal shareholder and chief executive officer of these entities.  Mr. Jia is presently a non-party due to the automatic stay in his personal bankruptcy case which is currently pending in the United States Bankruptcy Court for the Central District of California.   Mr. Jia exercises total control of Faraday and its affiliates through a close network of family members and lieutenants in his inner circle.

31.    In mid-October 2017, Mr. Yanfeng Wang ("Junmin Wang" or "Michael Wang"), Mr. Jia's confidant and finance handler, approached and invited Mr. Liu to travel from New York to Faraday's offices in California to meet Mr. Jia.   On October 17, 2017, Mr. Liu met Mr. Jia for the

first time, at Faraday's California office.  Mr. Jia invited Mr. Liu to join Faraday as his senior partner.

32.    In the ensuing months, Mr. Jia, Mr. Wang, and Ms. Deng sought to induce Mr. Liu to leave his lucrative New York law practice and join Faraday.   Mr. Wang heads Faraday's capital markets department and holds numerous titles, including president, chief financial officer and sole director of Faraday, and director of Smart King.  Ms. Deng handles Mr. Jia's personal finances and serves as president and director of Smart King and vice president of Faraday.

33.    Defendants knew that Mr. Liu would not leave his extraordinarily successful practice in New York unless they could induce him to believe that Faraday would offer a package of cash and equity compensation that was superior to what Mr. Liu was earning at Mayer Brown, and that Faraday had actually raised sufficient capital to make good on its compensation commitments to Mr. Liu.  Further, given that Defendants sought to lure Mr. Liu with promises of a substantial equity stake, it was imperative for Defendants to provide supposed "evidence" of the value of the equity that Mr. Liu would be granted, particularly given that Faraday was a privately held start-up company with no revenues and had not begun production.

34.    On October 25, 2017, Mr. Wang sent Mr. Liu a purported estimate of the value of the Smart King options (representing 2% of the total equity of Smart King) that would be issued to Mr. Liu if he joined Faraday.  According to the estimate, Mr. Liu's options would be worth approximately $43 million based on a "Series A Value."  This was prior to the Evergrande transaction described below.

35.    Beginning in or around January 2018, knowing how critical it was to induce Mr. Liu to believe in Faraday's financial viability and the value of its equity, Mr. Jia and Mr. Wang represented to Mr. Liu that Evergrande Health Industry Group Ltd. (together with its affiliates,

Case 1:20-cv-00919   Document 1   Filed 01/03/20   Page 8 of 24

"Evergrande"), a major conglomerate in the PRC, was investing $2 billion in Smart King in a

Series A offering.  This private securities transaction was not publicly disclosed at the time, and

thus Mr. Liu had no way of verifying the representations made by Mr. Jia and Mr. Wang.

36.     In January 2018, during meetings and teleconferences, Mr. Jia, Mr. Wang, and Ms.

Deng represented to Mr. Liu that on November 30, 2017, Evergrande completed its $2 billion

Series A investment in Smart King, which valued Smart King at $4.5 billion, and that Smart King

had actually received the $2 billion.  Mr. Jia, Mr. Wang and Ms. Deng also emphasized that since

Smart King was valued at $4.5 billion, each one percent of Smart King's equity was worth $45

million.

37.     On January 10, 2018, and again between January 22 and January 24, 2018, Mr. Liu

met Mr. Jia, Mr. Wang and Ms. Deng at Faraday's headquarters premises in California.  During

multiple meetings on these dates, Mr. Jia, Mr. Wang, and Ms. Deng touted the successful

completion of the Series A investment from Evergrande, including Smart King's receipt of

Evergrande's $2 billion investment.  Ms. Deng emphasized this point to Mr. Liu, repeatedly

assuring Mr. Liu that since the Series A offering was completed, money was not an issue.

38.     During these meetings, Mr. Liu repeatedly requested to view the Series A

documents and attempted to inquire about the details of the Evergrande transaction.  However, Mr.

Jia and Mr. Wang refused to provide Mr. Liu with the relevant documentation and details of the

Evergrande transaction, citing confidentiality obligations to Evergrande, but assured Mr. Liu that

the Series A transaction was handled by reputable international law firms including Sidley Austin

LLP and that Mr. Liu could be assured  of the validity and quality of the transaction.

39.     Unbeknownst to Mr. Liu, the representations made by Mr. Jia, Mr. Wang and Ms.

Deng were false.  The Series A investment was not "completed."  As Defendants knew (and

deliberately concealed from Mr. Liu), Smart King never received $2 billion.  Indeed, Evergrande invested only $300 million in Smart King on or about November 30, 2017, and would invest only $800 million by mid-2018 before terminating its relationship with Smart King.

40.     Defendants' representation that Smart King received a $2 billion investment was a highly material fact that Mr. Liu relied upon in deciding whether to accept Faraday's employment offer and, critically, in assessing the value of the equity compensation that was offered to him.  Mr. Liu reasonably believed that Faraday's prospects for success (and the value of the equity of Smart King, Faraday's parent) were significantly enhanced by Evergrande's $2 billion investment.

41.     As a further inducement to Mr. Liu to leave his lucrative practice at Mayer Brown in New York and join Faraday in California, in January 2018, Mr. Jia promised to pay Mr. Liu a $3 million signing bonus plus annual compensation of $1 million over the first five years of his employment.  Mr. Jia also promised that Mr. Liu would be entitled to participate in all benefit programs at Faraday at the same level as all senior executives, including being covered by directors' and officer's insurance.

42.     Starting in October 2017 and again in January 2018, Mr. Wang sent Mr. Liu draft employment agreements and communicated extensively with Mr. Liu in New York by telephone and email.

**The Employment Agreement**

43.     Unaware that Mr. Jia, Mr. Wang and Ms. Deng had fraudulently misrepresented the fact that Smart King had received $2 billion from Evergrande, on or about January 25, 2018, Mr. Liu entered into an employment agreement (the "Employment Agreement," attached as Exhibit A to this Complaint) with Faraday, Smart King, and certain of their affiliates (as defined collectively in the Employment Agreement, "FF").

44.     Mr. Liu signed the Employment Agreement in New York.

45.     Mr. Wang and Mr. Teddy Kang, a Human Resources manager at FF, signed the Employment Agreement on behalf of Faraday, Smart King, and certain of their affiliates.

46.     The Employment Agreement provides that Mr. Liu would serve as Global Chief Administrative Officer, Global General Counsel and Global Senior Advisor, as well as serving as a senior board member.  (Ex. A at 1).

47.     Under the terms of the Employment Agreement, FF agreed to guarantee Mr. Liu's employment for five years and pay him a comprehensive package of cash and equity compensation which included the following components.

48.     FF agreed to pay Mr. Liu a $3 million dollar signing bonus, payable in five equal installments of $600,000, with the first installment paid upon signing of the Employment Agreement and the remaining four installments paid on each of the four anniversaries of Mr. Liu's first date of employment.  Further, in the event of an early termination of Mr. Liu during the guaranteed five year term, he would receive all of the unpaid installment payments in a lump sum.

49.     FF further agreed to pay Mr. Liu a minimum annual base salary of $1 million during each of five years of his guaranteed five year term, *i.e.*, a minimum base salary of $5 million over the five year term.  If Mr. Liu was terminated "*for any reason*" during the five year term, he would receive the unpaid portion of the $5 million in base salary in a lump sum.

50.     FF further agreed to grant Mr. Liu 20 million shares of FF, which represented two percent of FF's total equity prior to its Series A round, with the shares to be issued (at Mr. Liu's election) in the form of restricted stock or options.  The Employment Agreement provides in relevant part:

> FF shall grant [Mr. Liu] at a minimum cost required by law and
> outright, 2% of FF's total equity shares pre Series A dilution in the

Case 1:20-cv-00029   Document 1   Filed 01/09/20   Page 11 of 29

form of restrictive stocks or equity option as [Mr. Liu] may select based on any of FF's available equity grant forms to select from, namely 20,000,000.00 equity shares representing 2% of the total and all of 1,000,000,000.00 equity shares of FF pre Series A, as FF has represented and warranted, with the FF established and standard equity share or option vesting schedule and any of FF's earliest available vesting schedules as [Mr. Liu] may select [].

(Ex. A at 2).

51.     The Employment Agreement further provides that this two percent equity interest (to the extent not already vested) would "*become immediately and fully vested to [Mr. Liu] upon any early termination by FF of [Mr. Liu's] employment within the guaranteed employment term with FF.*" (Ex. A. at 2).

52.     The Employment Agreement contained false and misleading representations of material fact.

53.     First, the agreement represented (consistent with what Mr. Jia, Mr. Wang and Ms. Deng falsely told Mr. Liu in January 2018) that FF "*successfully completed its first closing of Series A financing in December 2017.*"  This representation was false and misleading because Evergrande's $2 billion investment in Smart King's Series A had not "completed" and, as of the date of the agreement, FF had received only $300 million from Evergrande.

54.     Second, the agreement represented that Mr. Liu would "participate in all benefit plans and programs at the same level with all senior executives . . . including . . . insurances including . . . D&O," and that Mr. Liu "is entitled to indemnification . . . on terms no less than any other executives and employees."  These representations were false and misleading because Faraday did not maintain directors' and officers' insurance.

55.     Mr. Liu would not have entered into the Employment Agreement if he had known that it contained false representations.

11

**The Director Compensation Agreement**

56.     On or about February 2, 2018, as a further inducement to Mr. Liu to leave his New York law practice and join Faraday, Mr. Jia signed and entered into a Director Compensation Agreement (the "Director Agreement," attached hereto as Exhibit B) with Mr. Liu.

57.     In the Director Agreement, Mr. Jia repeated the false representations contained in the Employment Agreement.  Thus, Mr. Jia falsely represented that "*[Smart King] successfully completed its Series A financing in December 2017*."  Ex. B at ¶ 2.  Further, Mr. Jia represented that Mr. Liu would be "fully covered by [Smart King] with executive indemnifications to the extent set forth in [Smart King's] standard form of director indemnification agreement" (*id.* at ¶ 3) without disclosing the fact that Smart King did not maintain directors' and officers' insurance.

58.     In the Director Agreement, Mr. Jia personally agreed to pay Mr. Liu, upon certain trigger events such as an initial public offering or a change of control of Smart King, a cash amount equal to 1% of the value of Smart King shares as calculated prior to its Series A offering.

**Mr. Liu Resigns from His New York Partnership and Begins Work at Faraday**

59.     In early February 2018, Mr. Liu resigned from his partnership at Mayer Brown, putting an end to a highly lucrative income stream from New York.  Mr. Liu's resignation also amounted to a forfeit, under Mayer Brown's benefit plans, of significant retirement benefits.  Mr. Liu's decision to cut off these enormously valuable streams of income and benefits from New York sources, and begin work at Faraday in California, was made in reliance on Defendants' false representations as well as the promises they made in the Employment Agreement.

60.     On February 15, 2018, Mr. Liu began working at Faraday.

61.     In the spring of 2018, Mr. Liu moved into a housing compound close to Faraday's offices in California, which he and his family occupied.

62.    Concurrently with his start date, Mr. Liu was paid the first $600,000 installment of his $3 million signing bonus under the Employment Agreement.  This payment, as well as all other payments that Faraday made to Mr. Liu during his employment, was paid or wired to Mr. Liu's New York bank account.

63.    Between mid-February 2018 and October 2018 (when, as described below, he began to be stripped of his authority), Mr. Liu performed numerous tasks in connection with managing the legal and administrative functions of FF, including building up the legal team, drafting and implementing policies on technology and intellectual property protection and other critical areas, and overseeing a wide range of sensitive regulatory and compliance matters.

**Smart King Grants Options to Mr. Liu Pursuant to the Employment Agreement**

64.    On or about September 21, 2018, Smart King's board of directors adopted resolutions (the "September 2018 Resolutions") approving grants of options to numerous employees pursuant to the Smart King Ltd. Equity Incentive Plan.  Mr. Liu, who was then a member of Smart King's board, voted for the resolutions.

65.    Consistent with the Employment Agreement's requirement that Mr. Liu be granted 20 million shares of FF, the September 2018 Resolutions authorized the grant to Mr. Liu of 20,000,000 options to purchase Smart King stock.

66.    Under the September 2018 Resolutions, Mr. Liu's 20,000,000 options would vest in four tranches, representing 40%, 20%, 20%, and 20% of the total grant, with staggered commencement dates as follows.  The first tranche would vest over four years starting on February 15, 2018, Mr. Liu's employment start date.  The second tranche would commence vesting in year two, the third tranche would commence vesting in year three, and the fourth tranche commencing vesting in year four.

67.     In or about January 2019, Mr. Liu received confirmation that Solium Capital ("<u>Solium</u>"), the third-party manager of Smart King's employee stock option plans, had created an account for Mr. Liu.  Mr. Liu accessed his account information on Solium's website, which confirmed that he had been granted 20 million options under the vesting schedules described above.

68.     Mr. Liu has never received any notification that any of his Smart King options have vested.

**<u>Mr. Liu Learns of Serious Workplace Violations</u>**

69.     Beginning shortly after assuming his duties at Faraday, Mr. Liu observed illegal, discriminatory, and outrageous behavior by Mr. Jia and his clique.  Mr. Liu repeatedly advised Mr. Jia and his associates, through direct and open communications, to cease their misconduct.  Mr. Liu also worked with and directed Faraday's legal department to issue appropriate internal communications, and to draft and adopt policies and procedures designed to ensure compliance with applicable laws.  However, Mr. Jia and his clique largely ignored these efforts.

70.     Thus, for example, on numerous occasions, Mr. Jia brazenly announced his preference for working with younger employees, and that Faraday should selectively hire younger employees because they fit more of a "start-up image" and "an entrepreneurial environment," and that older employees are not desirable.   In response, at Mr. Liu's direction, the legal department worked to strengthen and update human resources policies, including with respect to preventing discrimination in hiring.

71.     In mid-2018, several employees filed internal complaints alleging sexual harassment and a hostile work environment at Faraday, including allegations that employees were pressured to hire attractive women for Mr. Jia.  In response, at Mr. Liu's direction, the legal department took steps to investigate complaints, enforce workplace policies, and conduct

14

management training.

72.    Mr. Liu was also concerned by reports that Mr. Jia was using Faraday as an immigration farm to obtain U.S. visas for numerous PRC nationals.  In May 2018, the U.S. Citizenship & Immigration Services Division of the Department of Homeland Security conducted an on-site inspection of Faraday's offices in Gardena, Los Angeles.  Mr. Liu reminded Mr. Jia of the importance of complying with U.S. immigration laws.  Further, at Mr. Liu's direction, the legal department took steps to ensure compliance with immigration law and to cooperate with the U.S. authorities.

73.    Mr. Jia and his coterie engaged in a pattern of bullying, threats, and harassment. Thus, for example, Mr. Jia made clear to senior management that if they dared to express any views that conflicted with Mr. Jia's views, he would fire and sue them.  Mr. Jia publicly scolded Faraday co-founder Nick Sampson before Faraday's management team, calling him an idiot.  Mr. Wang also threatened Mr. Sampson and Butch Darrow, Faraday's Vice President of Quality.

74.    On October 18, 2018, Mr. Jia sent an email to Faraday employees announcing mass layoffs.  In his email, Mr. Jia claimed that Faraday was eliminating untalented or undesirable employees.  Significantly, most (if not all) PRC nationals at Faraday who were applying for U.S. work visas were not laid off.  Mr. Liu was not consulted on the content of Mr. Jia's email or on the manner in which the layoff was conducted.

75.    During this time period, Mr. Liu actively instructed the legal department to issue memoranda and other communications urging Mr. Jia and Mr. Wang to comply with applicable laws relating to, among other things, employee layoffs, labor codes, fiduciary duties, immigration, financial controls, and privacy laws (so that Mr. Jia and his clique would not secretly record employee activities).  These memoranda were all disregarded by Mr. Jia and Mr. Wang.

15

**Mr. Jia Strips Mr. Liu of His Authority**

76.      By late October 2018, a majority of Faraday's management (mostly Western managers) recognized the dangers of Mr. Jia's abusive, self-serving behavior and mismanagement. They reached out to Faraday's principal shareholder, Evergrande, seeking its support in effecting a change of management.  The Company's outside counsel, Sidley Austin, was also part of this effort to save the company.

77.      On October 28, 2018, Mr. Liu politely suggested at a management meeting that Mr. Jia should consider stepping back and having other managers assume his responsibilities in the best interest of the company and all stakeholders.  In response, Mr. Jia became enraged, openly cursed Mr. Liu and threatened him.  Mr. Jia stripped Mr. Liu of his Global General Counsel position on the spot.  Mr. Jia's gang, including Mr. Wang and Ms. Deng, also jumped in to verbally attack and harass Mr. Liu.

78.      In response to this incident, multiple senior non-Chinese executives resigned immediately or shortly thereafter, include co-founder and SVP Nick Sampson; SVP and Head of Product & Engineering Peter Savagian; SVP & Head of Manufacturing Dag Reckhorn; VP and Head of Quality Butch Darrow; VP and Head of Technology Jeff Risher, and many more.

79.      Thereafter, Mr. Liu was sidelined, ignored, and retaliated against, and many of his management portfolios were taken away.

80.      In early November 2018, Mr. Liu requested a board meeting to discuss a number of issues, including Faraday's compliance with applicable law related to employee layoffs.

81.      In late November 2018, Mr. Jia threatened to fire Mr. Liu if Mr. Liu did not capitulate and carry out Mr. Jia's orders, even if such orders violated applicable law or were not in Faraday's best interest.  Mr. Jia's cronies made similar threats.

82.     On January 14, 2019, at Mr. Jia's request, Mr. Liu submitted a work plan for 2019.
The work plan set forth what Mr. Liu saw as the priorities for Faraday in 2019 and years ahead,
and how he would assist Mr. Jia and Faraday to work productively in such areas as law, intellectual
property protection, capital management, and government affairs.  Mr. Liu received no response.

83.     On January 23, 2019, Mr. Liu wrote to Mr. Jia directly, documenting the egregious
campaign of retaliation being orchestrated by Mr. Jia and his junta:

> I am concerned that you have stripped me of my job responsibilities
> due to the various complaints that I have raised regarding the
> company's failure to comply with various state and federal laws.
>
> As is widely known, at least since October 2018, my management
> responsibilities have been continuously reduced, removed and
> replaced by you, and my authority and support in performing my
> duties have also diminished, all without my advance knowledge or
> agreement. I have been very concerned about these actions, and I
> have protested to you many times during our past conversations. I
> have previously expressed to you my grave concern regarding the
> company's failure to comply with the laws of the State of California
> and the United States . . . For example, I have directly expressed my
> views to you and others at the company on how to best comply with
> laws regarding many company practices, including but not limited
> to, your improper authorization of the recording of meetings without
> required consent; immigration and work permit compliance issues
> which you have ignored; failing to adequately investigate sexual
> harassment complaints against management especially your close
> associates; retaliation against employees who have raised concerns
> regarding financial issues; and timely compliance with the WARN
> Act. I sincerely wish that you had not and would not retaliate against
> me for what I have done in performing my responsibilities and
> duties. I am committed to continue performing my responsibilities
> at the company based on contractual and legal obligations, as well
> as my dedication to work with you and all colleagues to bring our
> company to a success.

84.     Faraday, at Mr. Jia's behest and paralyzed by Mr. Jia's iron grip, never conducted
any investigation of the numerous legal and compliance issues identified by Mr. Liu.

85.     On February 4, 2019, Mr. Jia again verbally attacked Mr. Liu, ridiculing,

humiliating and abusing Mr. Liu with fabrications and insults.

**Faraday Wrongfully Terminates and Harasses Mr. Liu**

86.     On February 11, 2019, Mr. Jia told Mr. Liu that he was being terminated.  Mr. Jia threatened and abused Mr. Liu, while ridiculing Mr. Liu's January 23, 2019 email which documented extensive compliance issues at Faraday.  Mr. Jia told Mr. Liu that he knew he was breaching Mr. Liu's employment contract, but that he did not care.  Mr. Jia, among other threats, said that if Mr. Liu dared to challenge the termination in any way, Mr. Jia and the company would dedicate all of their resources to fighting Mr. Liu.  Mr. Jia crowed that he and the Company had unlimited financial resources.  Mr. Jia then left the room.

87.     Acting at Mr. Jia's direction, Qing ("Bob") Ye, a Faraday Vice President and a personal confidant and another personal finance handler of Mr. Jia, told Mr. Liu that if he dared to take action against the company and Mr. Jia, there would be "consequences" and that Mr. Jia and "we" would publicly and globally destroy Mr. Liu, including on Chinese and international media.

88.     Mr. Ye then immediately and personally escorted Mr. Liu from Faraday's offices, without giving Mr. Liu the opportunity to return to his office to retrieve personal items.

89.     Mr. Jia maliciously timed Mr. Liu's termination to occur just days before the first anniversary of Mr. Liu's employment, when Mr. Liu was due to receive the second $600,000 installment of his $3 million signing bonus under the Employment Agreement.  None of the remaining installments (totaling $2.4 million) were ever paid to Mr. Liu.

90.     But Mr. Jia was not finished.  To add insult to injury, Mr. Jia's clique continued to harass Mr. Liu after ejecting him from Faraday.

91.     On or about February 15, 2018, Mr. Liu's real estate broker in California reported that she was contacted by Ms. Deng.  Ms. Deng was attempting to talk the real estate broker into

permitting Faraday's goons to enter Mr. Liu's California residence without authorization from Mr. Liu.  The real estate broker refused to allow this illegal entry demanded by Ms. Deng.

92.     Mr. Liu also learned from a guard at his gated residential compound in California that suspected Faraday operatives, including Michael Wang, attempted to gain unauthorized access to his residence disguised as "plumbers" on numerous occasions.

93.     The abrupt, gangster-like termination of Mr. Liu severely impacted his health, causing physical injury and emotional distress.

**Defendants' Material Breaches of the Employment Agreement**

94.     After terminating Mr. Liu, Faraday failed to pay him the cash and equity compensation owed to him under the Employment Agreement.

95.     The Employment Agreement requires that in the event of an early termination of Mr. Liu during his guaranteed five year term, he would receive all unpaid installments on his $3 million signing bonus in a lump sum.  Faraday never paid Mr. Liu the unpaid portion of the $3 million signing bonus, which is $2,400,000, as required under the Employment Agreement.

96.     The Employment Agreement further requires Defendants to pay Mr. Liu a minimum base salary of $5 million over the five years of his employment, and that if Mr. Liu was terminated "for any reason" during that five year period he must be paid any unpaid portion of the $5 million in a lump sum.  Faraday never paid the unpaid portion of the $5 million in base salary, which totals approximately $4 million.

97.     Further, under the Employment Agreement, Mr. Liu is entitled to receive 20 million shares of FF, with the shares to be issued (at Mr. Liu's election) in the form of restricted stock or options.  The Employment Agreement requires that if Mr. Liu elects to receive the 20 million shares in the form of options, any unvested options must be vested immediately upon Mr. Liu's

termination.

98. As discussed above, the September 2018 Resolutions granted Mr. Liu options to purchase 20 million shares of Smart King stock, which were subject to a multi-year vesting schedule and remained entirely unvested as of the date of Mr. Liu's termination. Smart King and Faraday failed to fully and immediately vest Mr. Liu's 20 million options upon his termination as required by the Employment Agreement.

99. In October 2019, Mr. Jia filed for bankruptcy protection in the United States, listing personal debts of over $3 billion. Due to the automatic stay, Mr. Liu is presently unable to assert causes of action directly against Mr. Jia individually, notwithstanding Mr. Jia's egregious misconduct as detailed herein.

**Defendants' Damage to Mr. Liu**

100. Defendants, at Mr. Jia's behest, have inflicted massive damage upon Mr. Liu's career and earnings prospects.

101. By inducing Mr. Liu to resign from his New York partnership at Mayer Brown, Mr. Liu lost a lucrative equity partnership interest at a global law firm. He also lost the opportunity to become a retired partner at Mayer Brown, which carries significant economic benefits.

102. Further, Mr. Liu was induced to abandon extensive client relationships, which he transitioned to colleagues. Since being terminated by Faraday, Mr. Liu has not been offered any positions at any major law firms because he is perceived to have lost many of these client relationships.

103. Significantly, Mr. Jia's outrageous mistreatment of Mr. Liu is part of a pattern of fraud, trickery, and dishonesty by Mr. Jia that is now being exposed by authorities in the United States and the PRC.

104.    Thus, for example, on December 17, 2019, the office of the United States Trustee filed a motion in Mr. Jia's bankruptcy case, seeking the appointment of a Chapter 11 trustee.  The U.S. trustee stated that an independent trustee "is required to take control of the estate of Yueting Jia . . . an individual chapter 11 petitioner who has failed to uphold his fiduciary duty to the estate by engaging in dishonest behavior, pre and post-petition."

105.    Further, on December 31, 2019, the Shenzhen Stock Exchange announced disciplinary sanctions against Mr. Jia arising from his violations of PRC securities law, including a *lifetime ban* on Mr. Jia serving as a board member or senior officer of any public company.

106.    Additionally, Mr. Jia has repeatedly been designated by PRC courts at various levels as well as by PRC securities and other regulatory bodies as a "Dishonest Person Subject to Legal Enforcement."

107.    Mr. Jia is now a fugitive from justice, having refused to return to the PRC despite repeated requests from PRC authorities for him to return to the PRC to cooperate with legal investigations of securities fraud and other violations.

108.    At the time he agreed to join Faraday, Mr. Liu had no knowledge that Mr. Jia and his companies were engaged in securities fraud, deceptive practices, or other misconduct.  Now, as a result of the fraudulent and malicious actions taken by Mr. Jia and the Defendants that he controls, Mr. Liu's career and future earnings prospects lie in tatters.

## CLAIMS FOR RELIEF
## COUNT ONE
### (Breach of Contract)
### (Against Faraday and Smart King)

109.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

110.    Plaintiff, Faraday, and Smart King are parties to the Employment Agreement, which is a valid, binding and enforceable contract.

111.    Plaintiff has fully complied with all terms of the Employment Agreement.

112.    The Employment Agreement requires that in the event of an early termination of Mr. Liu during his guaranteed five year term, he would receive all unpaid installments on his $3 million signing bonus in a lump sum.   Faraday and Smart King breached the Employment Agreement by failing to pay Mr. Liu the unpaid portion of the $3 million signing bonus, which is $2,400,000.

113.    The Employment Agreement further requires Faraday and Smart King to pay Mr. Liu a minimum base salary of $5 million over the first five years of his employment, and also requires that if Mr. Liu is terminated "for any reason" during that five year period he must be paid any unpaid portion of the $5 million in a lump sum.   Faraday and Smart King breached the agreement by failing to pay the unpaid portion of the $5 million in base salary, which totals approximately $4 million.

114.    Further, under the Employment Agreement, Mr. Liu is entitled to receive 20 million shares of Smart King (representing 2% of the total equity of Smart King), with the shares to be issued (at Mr. Liu's election) in the form of restricted stock or options.   The Employment Agreement requires that if Mr. Liu elects to receive the 20 million shares in the form of options, any unvested options must be vested immediately upon Mr. Liu's termination.    In or about September 2018, Mr. Liu was granted options to purchase 20,000,000 shares of Smart King stock, which were subject to a multi-year vesting schedule and remained entirely unvested as of the date of Mr. Liu's termination.  Smart King and Faraday failed to fully and immediately vest Mr. Liu's 20 million options upon his termination as required by the Employment Agreement.

22

115.    Plaintiff is entitled to specific performance of his right to immediate vesting of his 20 million Smart King options.

116.    Plaintiff has suffered monetary damages proximately caused by the foregoing breaches in an amount to be proved at trial.

## COUNT TWO

### (Violation of Section 10(b) of The Exchange Act and Rule 10b-5)
### (Against All Defendants)

117.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

118.    Defendants falsely represented that in November 2017, Evergrande had invested $2 billion in Smart King in a Series A offering that valued Smart King at $4.5 billion.  Defendants made these false representations in connection with an offer to Mr. Liu of securities in Smart King, knowing that Mr. Liu would rely on it.

119.    Defendants knew that Smart King had only received $300 million in November 2017 from Evergrande, not $2 billion.  Defendants intentionally concealed the truth, refusing to allow Mr. Liu to examine the Series A documents and to inquire into the details of the transaction.

120.    Defendants' misrepresentations were made in connection with an offer and sale of securities to Mr. Liu.  By accepting an offer of employment in exchange for receiving securities, Mr. Liu effectively purchased securities.  That is, Mr. Liu exchanged something of value — the income stream and retirement benefits from his Mayer Brown partnership — for stock and/or options in Smart King.

121.    Through the foregoing conduct and as more fully described herein, Defendants, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, directly or indirectly: (a) employed devices,

schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person.

122.    By reason of the actions alleged herein, Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R.§ 240.10b-5.

123.    Mr. Liu has been damaged by the foregoing misconduct.

## COUNT THREE
### (Fraudulent Inducement)
### (Against All Defendants)

124.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

125.    In or about January 2018, Defendants falsely represented that in November 2017, Evergrande had invested $2 billion in Smart King in a Series A offering that valued Smart King at $4.5 billion.  Defendants also falsely represented that Mr. Liu would be entitled to directors and officers' insurance while working at Faraday.

126.    As Defendants knew, these representations were false and misleading.  Smart King never received $2 billion from Evergrande.  Smart King and Faraday did not maintain directors and officers' insurance.

127.    Defendants knew and intended Mr. Liu to rely upon their false representations.  In reliance on these false representations, Plaintiff was induced to sign the Employment Agreement, resigned from his lucrative equity partnership with Mayor Brown in New York and began working for Faraday in California.

128.    At the time the representations were made to Plaintiff, he believed them to be true.

Plaintiff would not have signed the Employment Agreement and accepted employment with Faraday, but for Defendants' false representations.

129.    By reason of Defendants' misrepresentations and as a result of those misrepresentations, Plaintiff suffered damages in an amount to be proven at trial, including lost income and retirement benefits that Plaintiff would have earned at Mayer Brown absent Defendants' fraud.

130.    The aforementioned conduct of Defendants was an intentional misrepresentation, deceit, or concealment of a material fact known to the Defendants, and was made with the intention on the part of the Defendants of thereby depriving Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and punitive damages.

## COUNT FOUR
**(Wrongful Termination in Violation of Public Policy)**
**(Against Faraday and Smart King)**

131.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

132.    During his employment, Plaintiff reported serious compliance issues and violations of law, including potential violations of immigration law, failures to adequately investigate sexual harassment complaints, illegal retaliation against employees, breach of employees' privacy, irregular financial activities and timely compliance with the labor law including the WARN Act.

133.    As a direct result of his whistleblowing, Plaintiff was wrongfully discriminated against by Smart King and Faraday.  Plaintiff's work responsibilities were reduced dramatically, and he was then terminated, all in violation of public policy.   Specifically, Plaintiff was terminated

in retaliation for truthfully expressing his concerns with regard to Faraday's failure to comply with applicable California and federal law.

134.    As a result of the illegal retaliatory actions of Smart King and Faraday, Plaintiff suffered humiliation, serious mental anguish, emotional and physical distress, and loss of past and future earnings and employment benefits and opportunities.

135.    As more fully set forth herein, the illegal retaliatory actions of Smart King and Faraday were willful, wanton, malicious, and oppressive and were done with the intent to cause Plaintiff the injury described herein and justify the awarding of exemplary or punitive damages in an amount to be determined at trial.

**COUNT FIVE**

**(Intentional Infliction of Emotional Distress)**

**(Against All Defendants)**

136.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

137.    The conduct of Defendants complained of herein was intentional, malicious and done for the purpose of causing Plaintiff to suffer humiliation, mental anguish, and emotional and physical distress.  Such conduct was orchestrated with the knowledge that Plaintiff's emotional and physical distress would thereby increase, and was done with a wanton and reckless disregard of the consequences to Plaintiff.

138.    Through such conduct, Defendants intentionally inflicted emotional distress on Plaintiff, proximately causing severe harms to Plaintiff including humiliation, mental anguish, as well as physical injury.

139.    As a result of said distress and consequent harm, Plaintiff has suffered such damages in an amount to be determined at trial.

140.     Further, Defendants acted fraudulently, maliciously, oppressively and with reckless disregard of Plaintiff's rights, health, emotional and physical well-being and safety, and thereby entitling Plaintiff to an award of punitive damages.

## COUNT SIX

### (Negligent Misrepresentation)

### (Against All Defendants)

141.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

142.     As described herein, Defendants made false statements and misrepresentations, which Defendants should have known were false, to Mr. Liu.

143.     Defendants knew and intended that Mr. Liu would rely upon such false statements and misrepresentations in considering whether to accept Faraday's employment offer.

144.     Defendants had a duty, as a result of their special relationship with Mr. Liu, to give correct information.

145.     Mr. Liu reasonably and justifiably relied on the misrepresentations to his detriment.

146.     As a direct and proximate result of Defendants negligent misrepresentations and omissions, Mr. Liu has been damaged.

## COUNT SEVEN

### (Declaratory Judgment)

### (Against Faraday and Smart King)

147.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

148.     Based on the terms of the Employment Agreement, upon termination, Mr. Liu was owed $2,400,000 in unpaid installments of his $3,000,000 signing bonus, as well as $4,000,000 of his $5,000,000 base salary.

27

149.    Further, under the Employment Agreement, Mr. Liu is entitled to receive 20 million shares of FF, with the shares to be issued (at Mr. Liu's election) in the form of restricted stock or options.  The Employment Agreement requires that if Mr. Liu elects to receive the 20 million shares in the form of options, any unvested options must be vested immediately upon Mr. Liu's termination.   In or about September 2018, Mr. Liu was granted options to purchase 20,000,000 shares of Smart King stock, which were subject to a multi-year vesting schedule and remained entirely unvested as of the date of Mr. Liu's termination.  Smart King and Faraday failed to fully and immediately vest Mr. Liu's 20 million options upon his termination as required by the Employment Agreement.

150.    Upon Mr. Liu's termination, Faraday and Smart King have refused to recognize or acknowledge Mr. Liu's right to $6,400,000 in unpaid salary and bonus compensation and failed to vest Mr. Liu's 20 million Smart King options.   Accordingly, a justiciable controversy exists, which is sufficiently definite and concrete to warrant declaratory judgment.

151.    Accordingly, Mr. Liu seeks a declaratory judgment that under the terms of the Employment Agreement, he is owed $6,400,000 in unpaid salary and bonus compensation and that his 20 million Smart King options must be vested immediately.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

(1) An award of damages against Smart King and Faraday for breaches of the Employment Agreement;

(2) An order requiring Smart King and Faraday to immediately vest Plaintiff's options to purchase 20 million shares of Smart King, as required by the Employment Agreement;

(3) An award of damages against all Defendants based upon their violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

28

(4) An award of damages against all Defendants based upon their fraudulently inducing Plaintiff to leave his lucrative partnership in New York and work for Faraday in California;

(5) An award of damages against Smart King and Faraday, based upon their wrongful termination of Plaintiff in violation of applicable California public policy;

(6) An award of damages against all Defendants, based upon their intentional infliction of emotional distress upon Plaintiff;

(7) An award of damages against all Defendants, based upon their negligent misrepresentations to Plaintiff;

(8) A declaratory judgment against Faraday and Smart King that Mr. Liu is entitled to $6,400,000 in unpaid salary and bonus compensation and that Mr. Liu is entitled to the immediate vesting of 20,000,000 Smart King options;

(9) An award of punitive damages against all Defendants, based upon their intentional and malicious conduct;

(10) An award of prejudgment interest, attorneys' fees, and costs in favor of Plaintiff; and

(11) Any such further and other relief that the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 3, 2020
New York, New York

SEIDEN LAW GROUP LLP

By:     /s/ Amiad Kushner
Amiad Kushner
469 Seventh Avenue, Fifth Fl.
New York, NY 10018
akushner@seidenlegal.com
(212) 523-0686

*Counsel for Hong Liu*

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**3200 Park Center Drive, Suite 250, Costa Mesa, CA 92626**

A true and correct copy of the foregoing document entitled (*specify*): **Reply to Plaintiff's Opposition to Motion to Dismiss Complaint Under Federal Rule of Civil Procedure 12(b) for Failure to State a Claim** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **04/30/2020**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Lei Lei Wang Ekvall    lekvall@swelawfirm.com,
  lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com
- Robert S Marticello    Rmarticello@swelawfirm.com,
  gcruz@swelawfirm.com;lgarrett@swelawfirm.com;jchung@swelawfirm.com
- Benjamin Taylor    btaylor@taylorlawfirmpc.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **04/30/2020**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.
Via FedEx Overnight Mail:
Honorable Vincent P. Zurzolo
United States Bankruptcy Court
255 E. Temple Street, Suite 1360
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 04/30/2020 | Lynnette Garrett | /s/ Lynnette Garrett |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                    **F 9013-3.1.PROOF.SERVICE**